**Harry SACHER, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 13302.**

United States Court of Appeals District of Columbia Circuit.

Argued Sept. 27, 1956.

Decided Jan. 3, 1957.

Petition for Rehearing Denied Feb. 6, 1957.

Mr. Hubert T. Delany, New York City, of the bar of the Court of Appeals of

New York, pro hac vice, by special leave of Court, with whom Mr. David Rein, Washington, D. C., was on the brief, for appellant.

Mr. John D. Lane, Asst. U. S. Atty., with whom Messrs. Oliver Gasch, U. S. Atty., Lewis Carroll and William Hitz, Asst. U. S. Attys., were on the brief, for appellee.

Before WASHINGTON, BASTIAN and BURGER, Circuit Judges.

BURGER, Circuit Judge.

Appellant, Sacher, was subpoenaed and appeared as a witness before the Subcommittee on Internal Security of the Senate Judiciary Committee where he refused to answer questions as to past or present membership in the Communist Party. He was cited for contempt and thereafter indicted on three counts under Title 2 U.S.C.A. § 192,[1] found guilty on all three counts and sentenced to six months' imprisonment and a fine of $1000. He appeals from a conviction after trial in the district court, having waived a jury trial.

The indictment charges that on April 19, 1955 Sacher appeared before the Subcommittee at a hearing in Washington, D. C., was asked and refused to answer three questions, each of which is the subject of a separate count of the indictment:

 1. Are you, Mr. Sacher, a member of the Communist Party, U.S.A.?

 2. Have you ever been a member of the Communist Party of the United States?

 3. Are you now or have you ever been a member of the Lawyers' Section of the Communist Party, U.S.A.?

Appellant challenges his conviction on various grounds: (1) He asserts that the statute punishes only a refusal to answer questions pertinent to the inquiry and argues that his possible membership in the Communist Party was not perti-

nent. (2) That even if pertinent, the remoteness of the information sought to the subject under inquiry infringes First Amendment rights. (3) Appellant urges that the testimony as to the Subcommittee's information on appellant's background was not admissible in the district court. (4) He claims the Subcommittee changed the subject of inquiry when he testified and that the two members present did not have the power to do so. (5) Appellant attacks the indictment as faulty because it does not charge his refusal to answer was "willful or deliberate or intentional." (6) He argues the source of the Subcommittee's jurisdiction rests upon a resolution of the parent committee which is "hopelessly vague, and leaves the resolution without meaningful boundaries." Appellant urges the "absence of [such] boundaries brings the Subcommittee's subpoena power in conflict with the Fourth Amendment."

(1)

■ To determine whether or not the questions set forth in the indictment were pertinent to the subject of the Subcommittee's inquiry, we look to the history of the inquiry as disclosed by the record. In 1950 the Senate adopted a resolution [2] which empowered the Committee on the Judiciary, or any authorized subcommittee, to study and investigate subversive activities in terms as follows:

 "*Resolved,* That the Committee on the Judiciary, or any duly authorized subcommittee thereof, is authorized and directed to make a complete and continuing study and investigation of (1) the administration, operation, and enforcement of the Internal Security Act of 1950 [50 U.S.C.A. § 781 et seq.]; (2) the administration, operation, and enforcement of other laws relating to espionage, sabotage, and the protection of the internal security of the United States; and (3) the extent, nature, and effects of subversive activities

---

1. Rev.Stat. § 102 (1875), as amended, 52 Stat. 942 (1938), 2 U.S.C.A. § 192.

2. Sen.Res. 366, 81st Cong., 2d Sess. (1950).

in the United States, its Territories and possessions, including, but not limited to, espionage, sabotage, and infiltration by persons who are or may be under the domination of the foreign government or organizations controlling the world Communist movement or any other movement seeking to overthrow the Government of the United States by force and violence."

By resolution a quorum of the Subcommittee, for purposes of taking sworn testimony, consisted of not less than two members and the presence of a quorum at the hearings described in the indictment is not in dispute. Early in 1955 the Subcommittee commenced a series of hearings described in the Committee Report as "Strategy and Tactics of World Communism (Significance of the Matusow Case)." Harvey Matusow had appeared before the Subcommittee on four occasions in 1952 as a professed former Communist giving evidence "to expose the Communist conspiracy." At the outset of the hearings here involved, the Chairman of the Subcommittee took note of the fact that Matusow had currently characterized his previous testimony before the Subcommittee as false. A public announcement had been made that Matusow's book was soon to be published on the subject of the recantation of his "false testimony."

It was aginst this background that the Chairman, in opening the hearings in February, 1955, recited the prior appearances of Matusow and asserted:

"* * * The purpose of the hearing now commencing is to inquire into this whole matter.

"* * * *

"As a result of testimony taken in this hearing, it may appear that Mr. Matusow told the truth in his original testimony before us and is now lying when he says that his original testimony was not the truth. It may appear that part of what he told us was true and part was untrue. It may appear that he never tells the truth by intent. It may ap-

pear that his recent conduct is designed simply to call attention to a book which is soon to be published under his signature, and that his motive for this shabby performance is merely low personal greed. It may appear that he has been the victim of pressure brought by Communists, as well as those who have a vested interest in concealing the Communist conspiracy, and he has finally broken under this pressure. Or there may be still another explanation.

"* * *

"The subcommittee in this series of hearings hopes to determine what is the truth. The subcommittee may be able to show, in some instances, what are lies. The subcommittee probably can and will try to make a record as to just what Mr. Matusow now says the truth is. The subcommittee also will seek to determine, from the testimony of this witness and others, all the facts surrounding this case, and to make as complete a record of those facts as possible."

The record discloses that prior to appellant's appearance before the Subcommittee it had "information respecting Mr. Sacher's connections with Communist and Communist front organizations going back over a period of a number of years, going back to at least as early as 1937." The Subcommittee had information that Sacher had been "connected with the International Labor Defense which was identified by Attorney General Biddle as the legal arm of the Communist Party." Testimony before Executive Sessions of the Senate Subcommittee identified Sacher as present at meetings attended only by high functionaries of the Communist Party; that he was a member of the American League for Peace and Democracy in 1939–40, which group was cited by the Attorney General as a subversive organization; that he was a trustee of the Jefferson School of Social Science, identified by the Subcommittee as "Communist controlled," and

that he had a part in various other organized activities characterized by the Committee as subversive, as well as personal relationships with known Communists. This testimony of Subcommittee legal counsel was received only on the issue of pertinency.

In addition, the record discloses the Subcommittee had information to the effect that the International Union of Mine, Mill and Smelter Workers (described in the Subcommittee's Report as "Communist controlled") gave cash to Cameron and Kahn, publishers, to finance the printing and publication of Matusow's book on recantation, that this publication was part of a concerted attack designed to discredit "anti-communist" witnesses and professed "former Communists," and that this entire scheme was the product of Communist lawyers. There was further information that appellant Sacher was one of the lawyers within the Communist Party who had formulated this plan, and that he probably was one of the two leaders. The accuracy of the Subcommittee's information on any of these subjects was not in issue; and the district court admitted this testimony only for the limited purpose of showing the pertinency of the Senate Subcommittee's line of inquiry.[3]

Thus, when the Subcommittee called appellant as a witness, it had information as to the following: (a) reports linking appellant with the Communist Party; (b) reports linking the Communist Party with a conspiracy to bring about a recantation by Matusow of his testimony against the Communist Party and members thereof; and (c) reports linking appellant with this alleged conspiracy.

Preliminary questions answered by Sacher established the following background: Sacher met Matusow two days before Matusow took the stand as a witness in support of a motion for a new trial for a Sacher client (Elizabeth Gurley Flynn) who had been convicted under the Smith Act; appellant had appeared as counsel for "leaders of the Communist Party, U.S.A." in a lengthy trial before District Judge Medina. Sacher had seen Matusow on the days when the motions for new trial for Sacher's client and others were heard before District Judge Dimock in New York; Matusow had given Sacher a 75 page report dated October 19, 1951, which Matusow had also given to the Federal Bureau of Investigation and the House Committee on Un-American Activities and perhaps others. In addition, Matusow had also given Sacher a diary "the first sheet of which was dated * * * sometime in 1948" and other sheets dated sometime in 1950, 1951 and 1952. Other sheets bearing notes of Matusow's testimony before the Subversive Activities Control Board were also received by Sacher from Matusow. Sacher testified he had conversations with Nathan Witt, counsel for Clinton Jencks, at about the time of the arguments before Judge Dimock. Both lawyers had a natural common cause in the efforts to secure a new trial for their respective clients; it is not doubted or challenged that as lawyers they had a right and a duty to make use of a possible bona fide recantation of Matusow's testimony by legitimate means.

■■ It is appellant's contention that the questions forming the basis of the indictment could not be pertinent to the subject of inquiry for appellant's testimony demonstrated he had no knowledge

---

3. "The Court: I am going to overrule the objection. I am going to state again that the objection would be well founded and the Court would sustain it if this testimony was given for the purpose of proving the facts contained in the witness' answer. We have to distinguish in our thinking between that and merely proving the relevancy of the questions addressed to the witness which are enumerated in the indictment.

"The Court is admitting this testimony merely to show the relevancy of these questions. Now, that relevancy may be established by showing that the committee had certain hearsay information which it wanted to investigate. That is entirely proper, just as I have indicated a little while ago that reasonable ground for issuing a warrant may be established by hearsay information." Transcript of Record, pp. 47–8.

of the circumstances leading to the recantation. If this were true an interested party could effectively determine the pertinency of questions and the inquiring body would abdicate in favor of the witnesses. Pertinency is not measured by the amount of information a witness may wish to disclose. The test is whether under the circumstances the information reasonably sought is germane to the subject of inquiry.[4] If it is proper, as appellant concedes, to investigate whether there existed "a general conspiracy to discredit government informers in the field of Communism," it was pertinent to question appellant as to his membership and participation in the group believed to have formed the conspiracy. That the Subcommittee's background information suggested the possible existence of such a conspiracy and plan, cannot be doubted. Against this background the three questions put to Sacher were plainly pertinent to an inquiry seeking "all the facts surrounding this [Matusow recantation] case."

Perhaps it would not be inappropriate to comment in passing on two other aspects of Sacher's protests to the questions put to him at the hearings. Sacher repeatedly placed his refusal to answer questions as to membership on high grounds of moral and political freedom. His refusal to answer the questions covered by the indictment brought on the following colloquy:

"[Senator McClellan.] Well, the Chair does not think that it is beneath the dignity of a good citizen of the United States to answer a question as to whether he is a member of an organization that seeks the overthrow of this Government by force and violence and therefore, the Chair propounds to you now the question, Are you now a member of the Communist Party of the United States?

"[Mr. Sacher.] Mr. Chairman, medieval inquisitors also thought there was no impropriety in asking those whom they regarded as heretics to answer the question.

"[Senator McClellan.] The Chair does not care for a lecture. The Chair asked you a question.

"[Mr. Sacher.] And I decline to answer that question, Mr. Chairman.

"[Senator McClellan.] The Chair orders you to answer the question.

"[Mr. Sacher.] I decline to answer that question on the grounds I have already stated.

"[Senator McClellan.] The Chair asks you another question. Have you ever been a member of the Communist Party of the United States?

"[Mr. Sacher.] I respectfully submit, Mr. Chairman, that my conscience dictates to me that I shall not, under your compulsion or anybody else's compulsion, make any disclosure of any of my beliefs, political, religious, economic, or social, past or present, and I decline to answer your question.

"[Senator McClellan.] The Chair orders you to answer the question.

"[Mr. Sacher.] I respectfully decline to answer it.

"[Senator McClellan.] The Chair asks you another question. Have you ever been a member of any organization, Communist Party or by any other name, that advocates and seeks the overthrow of the Government of the United States by force and violence?

"[Mr. Sacher.] I will say to the Chair that I have never been a member of any organization which I *believed* to be a teacher or advocate of the forceable or violent overthrow of the Government of the United States." (Emphasis added.)

Thus Sacher showed that he was willing to testify about associations with political groups upon the basis of *his* beliefs as to the objectives of those groups. This is hardly consistent with his protests that to answer "is incompatible

4. See United States v. Orman, 3 Cir., 1953, 207 F.2d 148.

with the dignity of the individual to make compulsory disclosure of his thoughts and his ideas and his beliefs." The injection of the element of *his* belief into the answer afforded him a shield in the form of a purely subjective test as to the aims of the groups he described. This willingness to testify about political associations in the colors of his own beliefs tends to cast doubt on the genuineness of his protests. This is not to say, of course, that the validity of an objection to the question depends upon the sincerity or motives which underlie the objection.

■ Secondly appellant argued at the hearing that the questions directed to him constituted an effort to "call an attorney to account" for his professional activities in representing a client. The record here presents no such issue. The record discloses that the Chairman pursued the inquiry fairly and judiciously often in the face of an attitude on the part of the witness which might well have provoked a less judicious and temperate presiding officer.

### (2)

■ If the questions be deemed pertinent, appellant next contends there was absent a substantial "public interest" to justify an infringement of his right under the First Amendment. It is difficult to imagine a clearer "overriding public interest" than an inquiry into an alleged conspiracy to discredit the congressional and judicial processes by suborning witnesses and by procuring recantations of testimony upon which Congress and the courts have theretofore relied. The Chairman's opening statement, supra 240 F.2d 49, made clear that one product of the inquiry might well be that Matusow had in fact testified falsely and that would be of concern to both Congress and the courts. On the other hand if a conspiracy existed to procure false recantations and thus cast doubt on the judicial process broadly as well as upon specific convictions, the legislative and judicial branches would be equally concerned.

### (3)

■ Third, it is urged that the testimony of the Subcommittee's legal counsel was inadmissible in the district court. As the district court repeatedly observed, this testimony was admitted for the sole purpose of establishing the pertinency of the questions.[5] Considerable latitude must be allowed to establish the background and basis for a given line of congressional inquiry. This court, in Watkins v. United States,[6] said "Congress has before it the important duty to legislate effectively, but at the same time wisely, upon the problems posed by the world communist movement. It cannot perform that duty without information. It ought not try to perform it without information." Furthermore, in a contempt proceeding, when the questions asked may not be pertinent on their face to the inquiry, it is the Government's duty to establish by other evidence this relationship.[7]

### (4)

■ It is also argued that the Subcommittee changed and enlarged the scope of the inquiry and appellant points to questions which the Subcommittee counsel sought to justify in the hearing by reference to possible legislation to fix additional standards for admission to practice in federal courts, e. g., to bar Communist Party members. We do not need to reach the question of whether the Subcommittee could enlarge the scope of the inquiry nor do we reach the propriety of a line of inquiry concerning practice of law by Communists. Assuming, *arguendo,* that the subject of practice of law by a Communist Party member was beyond the power and authority of the Subcommittee, the absence of authority to inquire into that area cannot affect the inquiries properly made

---

5. See note 3 supra.

6. 98 U.S.App.D.C. 190, 233 F.2d 681, 687, certiorari granted, 1956, 352 U.S. 822, 77 S.Ct. 62.

7. Bowers v. United States, 1953, 92 U.S. App.D.C. 79, 202 F.2d 447.

and pertinent to other authorized subjects being actively pursued by the Subcommittee. Early in the hearing the Subcommittee Chairman notified Sacher that the "primary purpose of this testimony is to establish a relationship or contact you have had with Mr. Matusow * * *" Thus, the question whether Sacher's activities in relation to Matusow and his recantation were purely professional or whether they were motivated by Sacher's involvement in a suspected Communist conspiracy was pertinent to the plainly announced subject of inquiry. There was no abandonment of the "Matusow Case" inquiry by reason of the brief excursion into discussion of possible legislation relating to law practice.

Moreover, the witness showed his awareness of the risk involved when he refused to answer the questions concerning membership in the Communist Party,[8] saying, "an inquiry to me concerning this matter [of membership] is not pertinent to *anything* with which this committee is concerned, and is not relevant to *any inquiry* that may properly be made of me." (Emphasis added.)

### (5)

Appellant's contention that an indictment under 2 U.S.C.A. § 192 must affirmatively charge a "willful or deliberate or intentional" refusal to answer the question is disposed of by this court's recent decision in Deutch v. United States, 98 U.S.App.D.C. 356, 235 F.2d 853 (1956), in which we held that a *refusal* to answer is a willful act per se.

### (6)

Appellant's final argument that the Subcommittee's jurisdiction rests on a resolution of the parent committee which is "hopelessly vague, and leaves the resolution without meaningful boundaries," the absence of which brings its subpoena power in conflict with the Fourth Amendment, is without merit. Barsky v. United States, 83 U.S.App.D.C.

127, 167 F.2d 241, certiorari denied, 1948, 334 U.S. 843, 68 S.Ct. 1511, 92 L. Ed. 1767.

The judgment below is

Affirmed

8. See Quinn v. United States, 1955, 349 U.S. 155, 75 S.Ct. 668, 99 L.Ed. 964.