**Harry SACHER, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 13302.**

United States Court of Appeals District of Columbia Circuit.

Argued Oct. 23, 1957.

Decided Jan. 31, 1958.

**830**

Mr. Telford Taylor, New York City, with whom Mr. David Rein, Washington, D. C., was on the brief for appellant.

Mr. William Hitz, Asst. U. S. Atty., with whom Messrs. Oliver Gasch, U. S. Atty., Lewis Carroll, John D. Lane and Harold D. Rhynedance, Jr., Asst. U. S. Attys., were on the brief, for appellee.

Before EDGERTON, Chief Judge, and PRETTYMAN, WILBUR K. MILLER, BAZE-LON, FAHY, WASHINGTON, DANAHER, BASTIAN and BURGER, Circuit Judges, sitting en banc.

BURGER, Circuit Judge.

Appellant Harry Sacher was convicted in the District Court under a three count indictment which charged him with violation of 2 U.S.C.A. § 192 for having refused to answer three questions[1] of a subcommittee of a Senate Committee

which questions were found to be pertinent to a subject then under inquiry.[2] Appellant was sentenced to six months imprisonment and $1000 fine. Thereafter this court affirmed the District Court[3] and while a petition for certiorari was pending in the Supreme Court, the case of Watkins v. United States[4] was decided. Shortly thereafter, the Supreme Court granted certiorari and remanded the instant case[5] for reconsideration in light of Watkins v. United States. This court then set the appeal for reargument before the court en banc, received additional briefs and heard arguments.

On remand appellant raises four issues which he contends are controlled by the Watkins case: (1) the indictment failed to allege essential elements of the offense; (2) the inquiry infringed First Amendment rights of privacy; (3) the Senate Resolution 366, which established the subcommittee, is invalid; (4) it was not indisputably clear to appellant that the questions were pertinent to the subject matter of the inquiry.

I. Sufficiency of Indictment.

While conceding that the "Watkins case does not, of course, deal directly with the sufficiency of the indictment," appellant urges his indictment was constitutionally insufficient because it did not recite "the nature of the matter under inquiry and that the matter under inquiry was within the subcommittee's delegated authority." In our view nothing said or implied in the Watkins opin-

---

1. Count 1: "Are you, Mr. Sacher, a member of the Communist Party, U.S.A.?"

Count 2: "Have you ever been a member of the Communist Party of the United States?"

Count 3: "Are you now or have you ever been a member of the Lawyers' Section of the Communist Party, U.S.A.?"

2. The announced subject under inquiry was the Matusow recantation.

On several occasions after his defection from the Communist Party and prior to the time of Sacher's appearance, Harvey Matusow had appeared before the Internal Security Subcommittee and described Communist infiltration activities. Early in 1955 Matusow recanted his tes-

timony and said he had "lied when he testified before the [Internal Security] subcommittee and on other occasions." Subsequently he executed affidavits, one of which was used by Sacher in a motion for a new trial for the defendant Elizabeth Flynn, who was convicted under the Smith Act, 18 U.S.C.A. § 2385, in a trial in which Matusow had been a witness against her.

3. 1957, 99 U.S.App.D.C. 360, 240 F.2d 46.

4. 354 U.S. 178, 77 S.Ct 1173, 1 L.Ed.2d 1273.

5. 354 U.S. 930, 77 S.Ct. 1396, 1 L.Ed.2d 1533.

ion suggests the Court intended to interpret Rule 7c, Fed.R.Crim.P., 18 U.S.C.A., to require that an indictment under 2 U.S.C.A. § 192 recite details of the authority and scope of the inquiry. We see no reason to alter our earlier holding that the indictment is sufficient.[6]

## II. Infringement of First Amendment.

■■ Appellant urges that "even if pertinent," information as to membership in the Communist Party or the "Lawyers' Section" thereof, "was altogether too remote from the subject under inquiry [the Matusow recantation] to justify an invasion of his protected freedoms," under the First Amendment. The Supreme Court has indicated that where the exercise of the investigative powers of Congress comes into conflict with the rights to freedom of expression and (presumably) freedom of association, the need for clarity in the congressional Resolution becomes more acute. "The delegation of power to the committee must be clearly revealed in its charter." United States v. Rumely, 1953, 345 U.S. 41, 73 S.Ct. 543, 97 L.Ed. 770, cited in Watkins. The Watkins opinion [354 U.S. 178, 77 S.Ct. 1185] also emphasizes that "not all such inquiries [which impinge on First Amendment freedoms] are barred" and that they are not invalid unless "unrelated to any legislative purpose." It is plain that the courts must find the presence of a valid purpose related to lawmaking to justify "compelled disclosure." Congress is not permitted to expose only to embarrass. We considered this contention carefully in our earlier opinion, saying, "It is difficult to imagine a clearer 'overriding public interest' than an inquiry into an alleged conspiracy to discredit the congressional and judicial processes by suborning witnesses and by procuring recantations of testimony upon which Congress and the courts have theretofore re-

lied." 99 U.S.App.D.C. 360, 366, 240 F. 2d 46, 52. We hold that appellant's right to refuse to say whether he is a member of the Communist Party is not greater than the right of the Senate to inquire into the conspiracy just described and to know appellant's connection, if any, with Communist action groups provided the answer might shed light on the primary inquiry. Even if we were to assume that the right to engage in Communist Party activity is a right protected by the First Amendment, which of course we do not concede, that right, not being absolute, must yield to a superior public need, such as that presented here. Nothing in the Watkins [7] opinion suggests that our prior holding in this respect should not be adhered to.

## III. Validity of Senate Resolution 366.

■ In a prosecution for contempt of Congress under 2 U.S.C.A. § 192, such as presented here, the resolution of the parent body must show that there was a valid legislative purpose for the inquiry. Unless this is shown, the courts cannot determine whether the inquiry was pursuant to a valid legislative purpose and whether the inquiry was within the authority delegated by the parent body. The Watkins case dealt with a resolution criticized by the Supreme Court for its vagueness. We are dealing with a different resolution. Senate Resolution 366 so far as we rely on it provides as follows:

> "*Resolved,* That the Committee on the Judiciary, or any duly authorized subcommittee thereof, is authorized and directed to make a complete and continuing study and investigation of (1) the administration, operation, and enforcement of the Internal Security Act of 1950; (2) the administration, operation, and enforcement of other laws relating to espionage, sabotage, and the protection of the

---

6. This court previously considered the sufficiency of the indictment in connection with Sacher's now abandoned point that the indictment failed to recite his failure to answer was "willful." 99 U.S.App. D.C. 360, 367, 240 F.2d 46.

7. In the Watkins opinion the Court emphasized that the indictment questions related to *past* activities of *other* persons, not of the witness.

internal security of the United States * * *."

Bare recital of this portion of the resolution discloses that it is not subject to the same criticism as was directed at the House Resolution under which Watkins was questioned. It sufficiently describes "the kind of investigation that the committee was directed to make." When appellant was before the subcommittee the Internal Security Act of 1950, 50 U.S.C.A. § 781 et seq., was recent legislation; in many respects it was novel, and its enforcement, and that of related laws was of acute interest and concern to the Congress, the Executive Branch and the public. The enforcement or lack of enforcement could be studied in various ways, including checking the truth or falsity of reports of conspiracies to frustrate the law and its enforcement by suborning witnesses. Such inquiries are important in amending and improving laws. We are satisfied that the resolution was valid, that investigation into the Matusow recantation was authorized by the resolution, and that the Matusow inquiry was pursuant to the valid legislative purpose plainly revealed by the resolution.

IV.  The Pertinency of the Questions.

█  The final argument urged by Sacher is three-pronged. First, he contends that the questions were not even *intended* to be pertinent to the Matusow inquiry, but were intended to be pertinent to an altogether different subject,[8] and so he cannot be held to have known the questions were pertinent to the Matusow inquiry. Second he urges that the questions were not *in fact* pertinent to the Matusow inquiry, and so he cannot be held to have known that they were pertinent. Finally, he argues that even assuming the questions were intended to be pertinent to the Matusow inquiry, and further assuming the questions were in fact pertinent to the Matusow inquiry, still, he was not aware of these two factors at the time the questions were put to

him; he correctly points out that under the Watkins case, to sustain a conviction it must appear that pertinency was made clear to the witness.

██  *Intended Subject Matter:* Appellant's contention is that the questions were not even intended to be pertinent to the Matusow inquiry, but instead, were intended to be pertinent to an inquiry relating, as he describes it, to "a measure * * * barring Communists from practice in the Federal courts." The determination of this issue is essentially one of fact the resolution of which depends entirely upon the record in the case.

As with almost any examination of a witness whether in court or before a committee, we find in this record a main thread of examination which is readily followed, and also occasional digressions. One digression was made from that main thread. In the original transcript this main thread, which is the Matusow inquiry, runs for 18 pages before the Count 1 question was asked. During the course of those 18 pages the witness resisted various questions, raised the issue of pertinency and after exchanges with the Chairman, gave answers covering in general his contacts with Matusow and with Communist leaders. Appellant contends the Count 1 question was asked in the context of this digression.

Shortly before the Count 1 question, a single question digressed into the subject of possible legislation controlling admission of Communist Party members to practice in Federal courts. However, the record conclusively shows that as a result of objections from appellant, the digression or "excursion" was promptly terminated and the line of questions brought back to "whether Matusow lied when he testified." The colloquy between the Chairman and appellant indisputably informed appellant that the digression was not approved by the Chairman and that he directed his counsel to ask the Count 1 question in order to "lay the foundation *for this*," (emphasis added)

8. Viz., the admission of Communists to practice in Federal Courts, which subject, he argues, was beyond the scope of the subcommittee's powers.

*i.e.,* the inquiry into "whether Matusow lied."[9] In this context the Count 1 question was asked. Shortly following, the Count 2 question was asked.

The questions following those covered by Counts 1 and 2 related generally to contacts with Communist Party leaders, attendance at gatherings where Communist Party members were present, including such gatherings which appellant explained as professional conferences or meetings with clients he was defending and inquiries specifically about being with named Communist Party members or leaders. As to most of these questions appellant said he could not recall. In this context he was asked the Count 3 question.

As to each of the indictment questions, as well as others, appellant protested against the alleged lack of pertinence or relevance of any inquiry about "political beliefs." He repeatedly and emphatically equated inquiries about Communist Party membership to "political" beliefs and professional associations.[10] As to the Count 3 question the Chairman explained:

> "This question was not related to your defending anyone in court. The question was related to your being present or being a member of a group of lawyers, presumably, osten-

sibly from the question—I do not know what the answer is—dedicated to the Communist Party."

Thus the record shows, indisputably, that the Count 1 question was plainly related by the Chairman's statement to the announced subject matter, "whether Matusow lied" both in point of its timing and in relation to the colloquy which *immediately* preceded it. Similarly the succeeding questions were in that same context, and similarly after the brief "excursion." Consequently, we hold that the questions involved here were intended to elicit answers which would throw light on the Matusow recantation inquiry; it was to the Matusow inquiry, and not to any other inquiry, that the questions were intended to be pertinent and to which they were in fact highly pertinent.

■ *Pertinence in Fact:* Appellant argues that Communist Party membership, even if shown, "could not conceivably have shed any light on the inquiry before the subcommittee." We do not concede this for a moment. It needs no discussion to see that it was pertinent to the Matusow inquiry to find out whether appellant had any connection with a Communist conspiracy to induce Matusow to recant.[11] Whether appellant was a Communist was logically one of a series of questions designed to disclose the

---

9. Appellant objected to the digression saying he had understood he was called to testify about Matusow's recantation and argued that he had demonstrated in the Federal Court that Matusow lied. In the course of his statement he repeated three times that "Matusow lied" concluding:

    "Let there not be made here an attempt to prejudice the determination not only by Judge Dimock, but by the people of the United States *as to whether or not Matusow lied when he testified* at the Flynn trial. * * * this is doing a disservice to the administration of justice.

    "Senator McClellan. *That* is what we are trying to find out. Now let us proceed, Mr. Counsel, and ask the proper questions to lay the foundation *for this.*

    "Mr. Sourwine. Are you, Mr. Sacher, a member of the Communist Party, U.S.A.?" (Emphasis added.)

10. We are unwilling to say that appellant's membership in the Communist Party, if he is a member, is "political" activity or a simple exercise of rights of association protected from Congressional inquiry in all circumstances. Indeed in the light of repeated pronouncements by all three branches of Government, we would not be free to do so even were we inclined, which we are not. Participation in the work of the Communist Party, U.S.A., is not a simple matter of flexing one's political ideas and beliefs.

11. We pointed out in our original opinion that when the subcommittee called Sacher it had (1) reports linking Sacher with the Communist Party, (2) reports linking the Communist Party with a conspiracy to bring about Matusow's recantation, (3) reports linking Sacher as one of the lawyers party to this conspiracy.

nature of his connection, if any, with the conspiracy.

■ In a legislative inquiry we do not find the conventional pattern of direct examination followed by cross-examination. There are no pleadings which serve to narrow the inquiry toward proof of specific issues framed in advance. The prime purpose of questions must be to get information rather than prove previously asserted claims. The witness is given wide latitude in making a statement of his own framing. A necessary preliminary is to identify the witness, his residence, occupation, general background, etc., for the record so as to give meaning to his testimony for members of the full committee or the entire Congress, few of whom ever see the witnesses. Once the witness is so identified and qualified by these "background" questions, interrogation as to the main subject matter takes place, covering the central facts, events, etc. A third phase of questions may then become pertinent, which like the background questions are pertinent on their face. This third phase is the process of testing the reliability of the witness or his possible bias and prejudice.

The Watkins case dealt with questions falling in the second phase or the main subject matter. The indictment questions fall within the third phase having to do with "testing" of answers previously given. Certainly no one would seriously suggest that the subcommittee must explain why it wants a witness to identify himself with any more explicitness than that the questions are preliminary or for background. Questions concerning a possible bias or the reliability of a witness are also pertinent on their face and if any explanation is called for it need be in terms no more explicit than that they are to test bias or reliability, *i.e.*, are for cross-examination.

Appellant had announced his fixed position "that Matusow lied when he testified" in the Flynn case. In refusing to answer the Count 1 question he said that "an inquiry to me concerning this matter [Communist Party membership] is not pertinent to anything with which this committee is concerned, and is not relevant to any inquiry that may properly be made of me."

The Chairman was not bound to accept this statement, for he had already explained to appellant concerning his earlier objections: " * * * you are subject to cross-examination on" statements made to the committee.[12]

In his statement immediately before and immediately after the Count 1 question, appellant was referring to the Matusow inquiry. His objection took fundamental issue with the subcommittee's right to test his answers for possible bias by cross-examination as to connection with the alleged Communist conspiracy under study. Evaluation of appellant's entire testimony would be highly influenced by the fact that he was a Communist, if indeed he was, and the best evidence on this crucial matter was the

12. A key to appellant's state of mind with respect to pertinency is disclosed in his pre-Watkins brief (filed July 1956) in which he stated, "Once it had been established that appellant had no information to give the subcommittee on the question under inquiry before it, *i. e.*, the circumstances leading to Matusow's recantation, the appellant obviously should have been excused. In this context, the probing into appellant's *political beliefs and affiliations* had no conceivable relevance to the subject matter under inquiry." (P. 23.)

At another point in appellant's pre-Watkins brief he said, "The scope of the investigation or the 'question under inquiry' was defined by the Chairman of the subcommittee, at the opening of the investigation, as dealing with the truth or falsity of the testimony given by one Harvey Matusow. * * *

" * * * The questions put to the appellant which formed the subject matter of the indictment *must be tested for pertinency as against this* [*the Matusow*] *subject matter* as stated by the Chairman.

"Tested against this criterion the questions clearly were not pertinent since the answer to the questions could not conceivably have shed any light on the inquiry before the subcommittee * *." (Pp. 18, 19, 20; emphasis added in above excerpts.)

first hand knowledge of the witness. If he was a member of a party or organization reported to have conspired to discredit disaffected former Communists who appeared as witnesses against the Communist Party, it would be vital for the Subcommittee to know that fact.

Nothing could be plainer than that one of the purposes of the indictment questions was to test the reliability of appellant's answers concerning his relationship to the Matusow recantation and his possible connection with a suspected conspiracy to discredit prosecution of Communist Party members. In view of this we have no doubt that the questions asked were *in fact* pertinent to the Matusow inquiry, and we so hold.

*Appellant's Awareness of Intended Subject Matter and Pertinence:* We reach last the heart of Sacher's case, which is the contention that even if the questions were asked with reference to the Matusow inquiry, he was not aware that they were pertinent to that inquiry. We have seen that the questions were intended to be pertinent to the Matusow inquiry, and were in fact pertinent thereto. But, under the Watkins case, it must also appear that Sacher was *aware* of these two elements at the time the questions were posed.

▮ At the threshold we must resolve the question of how awareness is to be demonstrated. Must it be shown that the witness himself experienced cerebral processes which included consciousness of this element, *i.e.*, that he was indeed *actually* aware, or is it sufficient to show that a reasonable person in the same circumstances would have been so aware? The latter, of course, is the historic standard of proving criminal intent.

While not expressly so stating, we think the Watkins opinion contemplates that the demonstration of pertinency must be of such clarity that a reasonable person in the situation of the witness would have understood the connection between the question and the subject

matter.[13] To interpret the Watkins opinion as establishing a purely subjective test would place the scope of legislative investigation largely, if not entirely, within the control of the witness. While a witness might, as we think this witness did, disclose his grasp of pertinency by his own responses, a witness who sat mute before a committee in the face of all explanations of "connective reasons" would place himself beyond the reach of compulsory process for all practical purposes. We do not think the Watkins opinion implied any such absurd result, sub silentio nullifying all power to compel testimony. Such a test would make a defendant in a contempt case the judge of his own guilt. Moreover it would remove control of legislative investigations from the Congress and place control in the witnesses.

The test of pertinency rationally must, therefore, be an objective test in these terms: on the whole evidence can it be said, beyond reasonable doubt, that a reasonable man in the situation of the particular witness would have known the question asked was pertinent to the subject under inquiry? Pertinence in this sense means that the specific question posed contemplates an answer which will shed some light on the subject under inquiry.

▮ With this test in mind, we turn to whether appellant knew or should have known that the subject matter to which the questions were intended to be pertinent was the Matusow inquiry, and that the questions were in fact pertinent to that inquiry and the manner in which they were pertinent.

The Watkins case application to this situation arises out of the following statement in that opinion [354 U.S. 178, 77 S.Ct. 1193]:

"*Unless* the subject matter has been made to appear with undisputable clarity, it is the duty of the investigative body, upon objection of the witness on the grounds of pertinency, to state for the record

13.   Cf. 43 Va.L.Rev. 803 (1957); 26 Geo.Wash.L.Rev. 98 (1957).

the subject under inquiry *at that time* and the *manner* in which the propounded questions are pertinent thereto. To be meaningful, the explanation must describe what the topic under inquiry is and the connective reasoning whereby the precise questions asked relate to it." (Emphasis added.)

In other words, unless it is clear the witness knows, he is entitled to an explanation of what the subject matter is, and how the questions are pertinent.

We have already shown that the bar admission "excursion" was ended, and the thread of inquiry was back on the Matusow case, when the questions were posed. Appellant's first words after the Count 1 question were that he understood he was called to testify about the Matusow recantation and he was prepared to answer questions concerning his participation in connection with that matter, but he simply was not going to discuss his "beliefs, religious, political, economic or social." Thus he demonstrated he *knew the subject was the Matusow case,* but claimed he did not think questions as to his possible Communist Party membership were pertinent to it. In so doing appellant showed he was taking the risks inherent in refusing to answer. Of course we are not foreclosed by appellant's statement that *he* could see no pertinency or relationship between Communist Party affiliation, if any, and the Matusow recantation. It is enough for our purpose that he *should* have seen the relationship and hence the pertinency.

In order to accept appellant's thesis, that he could not reasonably be held to be aware of pertinency, we must believe that an experienced lawyer could not understand that Communist Party membership would be important in judging the value of the testimony and the credibility of a witness called to testify about his part, if any, in an alleged Communist conspiracy to subvert justice.

In these circumstances we think the explanations, including the Chairman's statement, "You are subject to cross-examination * * * and that is what the committee is proceeding to do," would constitute a sufficient explanation even if addressed to a layman; addressed to a seasoned litigation lawyer of thirty years' experience, it was actually superfluous. Nevertheless it was given "for the record" and fully meets the criteria laid down by the Watkins case. If any witness could ever be in doubt about the pertinency of the instant questions to the inquiry into "whether Matusow lied when he testified" and whether there was a Communist conspiracy to discredit prosecution of Communist Party members, this appellant is not that man. By the very answers given and statements made in his testimony and which he formally argued in his briefs, appellant demonstrated that no explanation could possibly have satisfied him or added to his knowledge.[14]

A witness may not frustrate the legitimate process of inquiry by shutting his mind to explanation any more than he could do so by stuffing his ears with

14. "I refuse categorically, Mr. Chairman, to discuss my beliefs, religious, political, economic, or social. I do not do so on the ground of the Fifth Amendment. I do so because it is inconsistent with the dignity of any man to be compelled to disclose his political, religious, economic, social, or any other views. And I respectfully submit that an inquiry to me concerning this matter is *not pertinent to anything* with which this committee is concerned, and is not relevant to any inquiry that may properly be made of me." (Emphasis added.)

Also "I shall not, under your compul-

sion or anybody else's compulsion, make any disclosure of any of my beliefs, political, religious, economic, or social, past or present, and I decline to answer your question."

We note that Sacher appears not to have meant entirely what he said, for a few sentences later he abandoned this ground and revealed his "political" views to the extent: "I will say to the Chair that I have never been a member of any organization *which I believed* to be a teacher or advocate of the forceable or violent overthrow of the Government of the United States." (Emphasis added.)

cotton to prevent hearing the explanation. And where it is plain and clear that any reasonable man would grasp the pertinency of the question without explanation it would be sheer nonsense for courts to say that none the less someone must, as by playing a mechanically recorded message, parrot to the witness a recital of that which the evidence shows he knows.

We hold appellant's responses make manifest his *actual* awareness that the Matusow recantation was the subject matter to which the questions were related and that he was fully aware of the manner in which those specific questions were pertinent to that subject. Apart from appellant's actual state of mind, a witness so situated reasonably should have known and could not fail to have known that the subcommittee asked these questions intending to secure information bearing on the Matusow inquiry and bearing on his own reliability as a witness and such witness should have understood that the questions were therefore pertinent to that subject.

The dissenting opinion argues that "[t]he courts should be slow, however, to hold that a person shall be 'compelled' over his objection publicly 'to be a witness against himself' by supplying *obviously* self-incriminating information, particularly when the area protected by the First Amendment is threatened, though he does not rest his objection on the Fifth."

The short and simple answer to this is that every witness who thinks any answer will or may incriminate him has as absolute protection in the Fifth Amendment. Unconsciously, perhaps, the dissent shrinks from "forcing" a witness to raise the Fifth Amendment because some people may draw dark inferences from its use. Over recent years the frequent employment of the Fifth Amendment has, in the minds of some, brought it into "disrepute." The Fifth Amendment plainly—and properly—was intended as a shield against self incrimi-nation; the First Amendment was not. The use of the First Amendment to shield one from supplying "obviously incriminating information about himself" would be a perversion of the Constitution, needless so long as the Fifth Amendment stands. Should this perversion be sanctioned it would not be long before repeated use of the First as a haven from incrimination would "contaminate" that Amendment. Mere recital of these factors demonstrates the folly of trying to adjust constitutional interpretation to meet the shifting breezes of segments of public opinion and the prevailing modes of witnesses before legislative committees.

Appellant's conviction is

Affirmed.

FAHY, Circuit Judge, with whom EDGERTON, Chief Judge, and BAZELON, Circuit Judge, join (dissenting).

The guidance now afforded by Watkins v. United States, 354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273, was not available to the two-member subcommittee when it conducted the hearing out of which this case arose. In Watkins the Supreme Court held that upon objection by a witness because of the nonpertinency of a question the subject matter of the inquiry must appear "with indisputable clarity," else the investigative body must state for the record the subject then under inquiry and the manner in which the questions are pertinent thereto, with a description of the topic and the connective reasoning whereby the precise questions relate to it. Watkins, supra, 354 U.S. at pages 214–215, 77 S. Ct. 1173. The subcommittee in the present case had authority to take sworn testimony only upon a subject which had been designated by the parent Subcommittee on Internal Security, namely, "Strategy and Tactics of World Communism: The Significance of the Matusow Case." Concededly it could not enlarge or change the subject of its inquiry.[1]

1. S.Res. 366, 81st Cong., 2d Sess., to which the Internal Security Subcommit-tee of the Senate Committee on the Judiciary owes its authority, provides,

Appellant, though at times protesting, answered all questions until asked by subcommittee counsel whether he had ever served a prison sentence. He expressed doubt as to the legislative purpose of this question. Thereupon the Chairman inquired of subcommittee counsel. He responded in the presence of the witness that legislation for the purpose of fixing additional standards for the practice of law in federal courts was under consideration and that it was germane to consideration of such legislation to inquire into circumstances involving the practice of law in federal courts by Communists or by those who defend Communists. He said he believed the inquiries in the Matusow case have bearing upon "that legislative problem now pending before the committee."[2] This was a clear departure from the subject about which the subcommittee was authorized to take testimony. The Chairman said he thought counsel "should lay a foundation for that first by asking the witness if he is a member of the Communist Party, if he has ever been, and so forth."[3] The witness was then permitted to state his understanding that he was to be interrogated concerning the Matusow recantation, that this inquiry into his political beliefs and associations was diversionary, and that if the com-

mittee desired to know how judicial procedures should be improved it should await Judge Dimock's judgment on what had transpired with respect to Matusow and the Flynn trial (in which appellant had been engaged), adding that this line of questioning was doing a disservice to the administration of justice. The Chairman then said, "That is what we are trying to find out. Now let us proceed, Mr. Counsel, and ask the proper questions to lay the foundation for this."[4]

The majority of the court, while characterizing "a single question" as having "digressed into the subject of possible legislation controlling admission of Communist Party members to practice in Federal courts," [5] conclude that the main thread of inquiry persisted and that the Chairman, apparently by the statement last quoted, returned to the Matusow subject. Surely the witness would not have so understood with the indisputable clarity required by Watkins. On the contrary, it seems reasonably clear the Chairman at that point was not returning to the Matusow subject but was repeating in substance what he had said with regard to the digression from that subject, namely, "The Chair thinks you should lay a foundation for that first by asking the witness if he is a member of

"A majority of the members of the [Judiciary] committee, or duly authorized subcommittee thereof, shall constitute a quorum for the transaction of business, except that a lesser number to be fixed by the committee, or by such subcommittee, shall constitute a quorum for the purpose of administering oaths and taking sworn testimony."
96 Cong.Rec. 16872 (1950). See also S.Res. 180, 81st Cong., 2d Sess., 96 Cong. Rec. 1284 (1950); S.Rep. 1208, 82d Cong., 1st Sess. (1950). On February 7, 1955, nine Senators were appointed to the Subcommittee. (G.Ex. No. 9.) On April 20, 1955, the Subcommittee authorized the taking of sworn testimony by one member. (G.Ex. No. 6.)
When appellant appeared on April 19, 1955, only two members were present. Their authority under S.Res. 366 was limited to administering oaths and taking sworn testimony. They could not establish or change a subject under in-

quiry; that is "business" for the transaction of which there must be a majority of the Subcommittee present, as there was on February 21, 1955, when the subject under inquiry here involved was established. See Hearings Before the Subcommittee on Internal Security of the Senate Committee of the Judiciary, "The Significance of the Matusow Case," 84th Cong., 1st Sess., pt. 1, at 1–3; pt. 10, at 827–40 (1955).

2. Hearings, pt. 10, at 835 (1955).

3. Ibid.

4. Id. at 836.

5. The Solicitor General, in his memorandum filed with the Supreme Court opposing certiorari, refers to the subject of practicing law as a "digression" from the Matusow matter. Brief in Opposition to Petition for Certiorari, pp. 14–16, Sacher v. United States, 354 U.S. 930, 77 S.Ct. 1396, 1 L.Ed.2d 1533.

the Communist Party, if he has ever been, and so forth," [6] the foundation referred to being with respect to the subject of practice in federal courts by Communists or those who defend them, not the Matusow case.

This view is consistent with the nature of the questions then asked the witness, a lawyer practicing in federal courts: The first question was, "Are you, Mr. Sacher, a member of the Communist Party, USA?" [7] His refusal to answer this and the question which soon followed as to whether he had ever been a member of the Party, constitute the bases for the first and second counts of the indictment. The third count rests upon his refusal to answer the related question as to membership in the Lawyers' Section of the Communist Party, U.S.A., which he declined to answer on grounds previously stated as to the pertinency or relevancy of an inquiry concerning his political beliefs or affiliations. The Chairman answered this objection by pointing out to him the general duty, when it came to the security of our country, for the Congress to try to ferret out and expose these things as they relate directly to the national security, and "for that reason the Chair thinks that the question is proper and directs you to answer it." [8] This explanation bearing on pertinency did not have a tendency to advise the witness that the questions were pertinent, or that the subcommittee considered them pertinent, to the Matusow inquiry, the subject the subcommittee was authorized to pursue.

We do not examine the question of pertinency in the light of the full authority of the parent Internal Security Subcommittee itself under its own charter, S.Res. 366, n. 1 supra; for the prosecution before us requires pertinency to the single inquiry involving the Matusow case. As to this, it is no help to say that this court can itself now conclude from its own appraisal of the nature and implications of the Matusow case that the questions were pertinent to that subject of inquiry; for the witness at the time the questions were asked was "entitled to have knowledge of the subject to which the interrogation is deemed pertinent." [9] And the subject of the knowledge, of course, must be the authorized subject of inquiry.

Our approach to the case is with a consciousness that a First Amendment problem lies in the background, in which situation, as in United States v. Rumely, 345 U.S. 41, 73 S.Ct. 543, 97 L.Ed. 770, the courts will "construe narrowly the resolution describing the committee's authority." [10] Moreover, "when First Amendment rights are threatened, the delegation of power to the committee must be clearly revealed in its charter." [11] By the same reasoning pertinency of the questions to the revealed delegation of power must be clear to the witness when he is testifying. The required clarity is not supplied when pertinency is then explained to the witness in terms of a nondelegated subject of inquiry.

We have in mind also that our view of this case does not affect the authority of the Congress to obtain the information the subcommittee sought. It does not prevent Congress from ascertaining the facts from voluntary witnesses or other sources. The courts should be slow, however, to hold that a person shall be "compelled" over his objection publicly "to be a witness against himself" by supplying *obviously* self-incriminating information, particularly when the area protected by the First Amendment

6. Hearings, pt. 10, p. 835.

7. Id. at 836.

8. Id. at 838.

9. Watkins v. United States, 354 U.S. at pages 208–209, 77 S.Ct. at page 1190, and see concurring opinion of Mr. Justice Frankfurter, 354 U.S. at page 217, 77 S.Ct. at page 1194.

10. Id., 354 U.S. at page 198, 77 S.Ct. at page 1184.

11. Ibid.

is threatened,[12] though he does not rest his objection on the Fifth. In many instances reference to the Fifth is necessary to indicate that the answers might tend to incriminate the witness. Individual values sought to be protected by the Bill of Rights should cause the courts not to coerce unnecessarily by the penalty of the criminal law answers which might publicly convict the witness of unfaithfulness to a standard of good citizenship held by all but a few of his fellow citizens. Unless some strong need requires that the information be obtained in this particular manner from the witness himself we think it should be secured by other means. Be that as it may, we think it follows from Watkins that unless such public self-condemnation is sought by the investigative body with respect to a legislative subject clearly within the scope of that body's authority, and unless this is made entirely clear to the witness, the witness may not be convicted of crime for refusing to respond. We cannot find on the record before the subcommittee that appellant should have known with the clarity required by Watkins that the questions were pertinent, and were asked as being pertinent, to the Matusow investigation. He could well have believed from their immediate context that they were asked as pertinent to the entirely different legislative purpose referred to by subcommittee counsel, namely, the practice in federal courts of Communists or persons defending Communists, a subject about which the two-member subcommittee conducting the hearing had not been authorized to take testimony.[13]

WASHINGTON, Circuit Judge (dissenting).

I think one of the main thrusts of Watkins was this: that the courts should not sanction the criminal conviction of a person who refuses to answer questions which touch upon First Amendment rights and which appear designed to produce "public self-condemnation," in Judge Fahy's phrase, unless there is shown clear legislative authority, within the framework of the constitutional responsibilities of the Congress. So viewed, I think this conviction cannot stand.

12. That First Amendment rights were threatened by the questions is clear, Sweezy v. State of New Hampshire, 354 U.S. 234, 250, 77 S.Ct. 1203, 1 L.Ed.2d 1311; Konigsberg v. State Bar, 353 U.S. 252, 261, 77 S.Ct. 722, 1 L.Ed.2d 810; American Communications Ass'n v. Douds, 339 U.S. 382, 393, 70 S.Ct. 674, 94 L.Ed. 925.

13. We have considered the views of the majority of this court that the questions were made pertinent by the Chairman's statement to the witness that he was "subject to cross-examination * * * and that is what the committee is proceeding to do." Hearings, pt. 10, p. 833. We do not give this statement the effect attributed to it by the majority; it preceded the digression with respect to practice in federal courts and did not prevent that digression from occurring. And as to Count 3, the Chairman's statement after the witness' refusal to answer, that the question was not related to the witness defending anyone in court but to his being present or a member of a group of lawyers presumably dedicated to the Communist Party, does not suffice to eliminate the diversion when the course of the hearing is read and considered as a whole. When so read and considered, the Chairman's statement, while not implying criticism of the witness for defending a particular case in court, could reasonably have been thought by the witness to refer to the subject matter of the diversion rather than to the Matusow inquiry.