**EXXON CORPORATION, Appellant,**

v.

**FEDERAL TRADE COMMISSION et al.**

**KERR–McGEE CORPORATION,
Appellant,**

v.

**FEDERAL TRADE COMMISSION et al.**

**UNION CARBIDE CORPORATION,
Appellant,**

v.

**FEDERAL TRADE COMMISSION et al.**

Nos. 77–1302 to 77–1304.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 13, 1978.

Decided Oct. 19, 1978.

Rehearing Denied Dec. 6, 1978.

As Amended Dec. 19, 1978.

584

Roberts B. Owen, Washington, D. C., for appellant Exxon Corp.; argued on behalf of all appellants.

J. Randolph Wilson and Steven S. Rosenthal, Washington, D. C., were on the brief, for appellant Kerr-McGee Corp.

James H. Wallace, Jr., and Thomas C. Arthur, Washington, D. C., were on the brief, for appellant Union Carbide Corp.

Gerald P. Norton, Acting Gen. Counsel, F. T. C., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry and Joel S. Perwin, Asst. U. S. Attys., Je-

rold D. Cummins, Acting Asst. Gen. Counsel, and Arthur W. Adelberg, Atty., F. T. C., Washington, D. C., were on the brief, for appellees.

Michael R. Lemov, Washington, D. C., was on the brief, for amicus curiae, Congressman John E. Moss, urging affirmance.

Before ROBINSON, MacKINNON and ROBB, Circuit Judges.

Opinion for the court filed by Circuit Judge MacKINNON.

MacKINNON, Circuit Judge:

Exxon appeals from the district court's refusal to grant injunctive or declaratory relief and from its subsequent denial of a stay pending appeal. At issue is whether any protective measures should be imposed on the Federal Trade Commission (hereafter the "Commission" or the "FTC") with respect to the divulgence to Congress of "trade secrets" obtained by it under the compulsion of a subpoena.[1] The controlling statute provides:

The [Federal Trade] Commission shall also have power—

\* \* \* \* \* \*

(f) To make public from time to time such portions of the information obtained by it hereunder, *except trade secrets* and names of customers, as it shall deem expedient in the public interest . . .

15 U.S.C. § 46(f) (emphasis added). The parties do not dispute, nor could they after our decision in *Ashland Oil, Inc. v. FTC*, 179 U.S.App.D.C. 22, 548 F.2d 977 (1976), that Congress has a right of access to such infor-

---

1. There is no question that the information in question here qualifies under this court's definition of "confidential" information for purposes of the Freedom of Information Act, 5 U.S.C. § 552 (1970). In *National Parks and Conservation Assoc. v. Morton*, 162 U.S.App.D.C. 223, 228, 498 F.2d 765, 770 (1974), *rev'g* 351 F.Supp. 404 (D.D.C.1972) we stated that information will be considered confidential if its disclosure is likely to "cause substantial harm to the competitive position of the person from whom the information was obtained." Production forecasts such as are at question in this case would clearly cause such competitive harm were they

disclosed to competitors. *See* JA 64 (Dickeman Affidavit for Exxon Co.); JA 73 (Zitting Affidavit for Kerr-McGee Co.); JA 78 (Thurber Affidavit for Union Carbide Co.). Trade Secrets and other confidential data are not immune to FTC investigation, *Covey Oil Co. v. Continental Oil Co.*, 340 F.2d 993 (10th Cir.), *cert. denied*, 380 U.S. 964, 85 S.Ct. 1110, 14 L.Ed.2d 155 (1965). For the broad range of the Commission's subpoena power in general, *see, e. g., Menzies v. FTC*, 242 F.2d 81 (4th Cir.), *cert. denied*, 353 U.S. 957, 77 S.Ct. 863, 1 L.Ed.2d 908 (1957); 12 Von Kalinowski, Trade Regulation § 86.06 (1977).

mation, including trade secrets. The issue before us concerns solely the question of notice to parties prior to disclosure of their confidential information and of safeguards to ensure the continued confidentiality of such information once disclosed to the Congress.

## I

In 1975, pursuant to a subpoena, Exxon, Kerr-McGee, and Union Carbide made available to the Commission information relating to their ownership, operation of, and future expectations for their uranium holdings.[2] It is undisputed that some of this material involved trade secrets, particularly the data concerning the production and projected yield of individual mines. In April of 1976, in the course of considering S. 489, 94th Cong., 1st Sess., which proposed prohibiting oil companies from owning interests in fuel reserves other than oil and gas, Senator Hart wrote to the Commission on official stationery of the Senate Judiciary Subcommittee on Antitrust and Monopoly requesting the Commission to make available all information it had concerning the coal and uranium holdings of the oil companies.[3] The F.T.C., because of the relationship of its functions to those of Congress, treats such congressional requests as compulsive, even though they lack the formal status of congressional subpoenas. However, the Commission had previously assured the companies in writing that in the event of any congressional request for confidential information (trade secrets), it would both advise the Members of Congress who submitted the request that the information should be considered confidential

when received, and give the companies themselves ten days prior notice of disclosure, whenever such notice was "reasonably possible" (Government's Brief at 2–3).

In early May, the Commission notified appellants of the subcommittee's requests, and appellant Union Carbide quickly obtained a court order restraining the disclosure of the requested information until ten days after the decision in the then pending *Ashland Oil, Inc. v. F.T.C.* case. Shortly after the Union Carbide order was issued, the subcommittee forwarded a formal request for *immediate* access to the information, and the Commission informed the parties that it would disclose the data requested the following day, except insofar as protected by the court order obtained by Union Carbide. At this point, Kerr-McGee and Exxon also succeeded, despite only 23 hours advance notice, in obtaining a preliminary injunction barring disclosure until the decision in *Ashland Oil.*

Some months later, in September, 1976, in *Ashland Oil, Inc. v. F.T.C.*, 179 U.S.App. D.C. 22, 548 F.2d 977 (1976) this court decided that it was permissible for the Commission to disclose confidential information to Congress.[4] The district court thereupon dissolved the preliminary injunction granted to appellants, on the grounds that they were unlikely to succeed on the merits, as *Ashland Oil* had determined that disclosure to Congress did not constitute "public disclosure," and also that the companies were not threatened with irreparable injury.[5] The district court also denied appellants' request that the Commission be required to give ten days advance notice before reveal-

---

**2.** Appellant Union Carbide also submitted, and sought to protect, data relating to its coal holdings. Government Brief at 2–3.

**3.** Senator Hart at the time was Chairman of the Senate Subcommittee on Antitrust and Monopoly. He wrote to the FTC following receipt of a letter from Senator Abourezk, also a member of the Subcommittee on Antitrust and Monopoly. In his letter Senator Abourezk suggested that the information in the FTC's possession was "crucial" to the consideration of S. 489. JA 61.

**4.** *Ashland Oil* did not consider or determine the amount of notice the Commission might be required to give corporations whose trade se-

crets were to be divulged to Congress, or what steps the Commission should or could take to safeguard the confidentiality of these secrets once revealed to Congress. The question in *Ashland Oil* simply was whether or not the F.T.C. was authorized to divulge trade secrets at all, in light of 15 U.S.C. § 46(f)'s prohibition against "making public" such secrets. Likewise *Ashland Oil* did not consider the issue of liability for damages resulting from the disclosure of trade secrets in violation of 15 U.S.C. § 46(f).

**5.** JA 90.

ing trade secrets to Congress. From this decision the appellants briefly obtained a stay pending appeal or until "further order of this Court,"[6] but this stay too was later vacated in light of *Ashland Oil*.[7]

Some of the information that the appellants sought to protect has already been disclosed, and this appeal is moot as to this material.[8] Other information, although vulnerable to disclosure whenever Congress may request it, remains undivulged.[9] As regards this information, and appellants' general request that the Commission be required to give ten days notice prior to disclosure, and that reasonable steps be required to ensure that Congress will keep such trade secrets confidential, the issues before us are not moot, and we resolve them here.[10]

It should be noted, however, that a large part of the questions raised by appellant while not moot, represent an attempt to have this court virtually engage in rulemaking for the FTC.[11] Our situation is somewhat analogous to those in which expansive conceptions of standing and ripeness have

occasioned adjudications in which the courts have been cast in the inappropriate, and possibly *ultra vires*, role of attempting to resolve essentially abstract questions in reviewing agency regulations, see, e. g., AS-ARCO, Inc. v. EPA, 188 U.S.App.D.C. 77, 578 F.2d 319 (1978) (MacKinnon, J., concurring in part and dissenting in part). In this case, appellants request this court to assume the inappropriate and potentially overreaching role of promulgating confidentiality guidelines for the Commission. We have, however, explicitly restricted our judgment in a previous case dealing with similar issues to the facts of that case, eschewing establishing any broad principle limiting the Commission's actions, see FTC v. Texaco, Inc., 180 U.S.App.D.C. 390, 555 F.2d 862 (en banc), cert. denied, 431 U.S. 974, 97 S.Ct. 2940, 53 L.Ed.2d 1072 (1977) and we see no reason, nor any justification for doing otherwise in deciding this appeal.

## II

■ Concerning appellants' prayer for a permanent injunction requiring ten days

---

6. JA 92, Order of March 30, 1977.

7. JA 96, Order of May 6, 1977.

8. The information disclosed consisted of the data concerning Union Carbide's coal holdings.

9. Senator Kennedy, the new Chairman of the Subcommittee on Antitrust and Monopoly, expressed the continued interest of the Subcommittee in the information originally requested by the late Senator Hart by a letter to Judge Leventhal of this Circuit Court, dated April 13, 1977. Senator Moss, Chairman of the Senate Committee on Oversight and Investigation, by letter of April 19, 1977 to the Clerk of the United States Court of Appeals expressed a similar interest. The status of these letters in this proceeding is unclear since the record does not indicate the authority for their issuance.

10. If the FTC during the course of this appeal discloses the as yet undivulged information, this appeal will become moot as regards such information. However, appellant's request that the court issue a protective order requiring certain procedures to protect confidential data in the hands of the FTC when such data is requested by Congress will not itself be mooted by the disclosure of the information involved in this particular case. A suit for an injunction is not moot where the action which plaintiff seeks to enjoin may recur in the future. *United*

States v. Concentrated Phosphate Export Ass'n, 393 U.S. 199, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968); see also, United States v. W. T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). The FTC admits that it fully intends to hold open the option of disclosing trade secrets in the future without the safeguards sought by appellants. The fact that some issues in a case have become moot does not prevent a court from reviewing nonmooted issues where these are sufficiently significant that the cause of action remains justiciable, e. g., Super Tire Engineering Co. v. McCorkle, 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974); United Public Workers v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1946); 6A J. Moore, Federal Practice § 57.13 at 57–121–125.

11. Appellants assert (see Reply Brief for Appellant Exxon at 31–35) that the purpose of obtaining notice prior to disclosure is to have sufficient time to seek judicial review of the proposed divulgement. In this case, however, all appellants were able on very short notice to secure prior judicial review. Thus the fact pattern before this court is a particularly inappropriate one in which to evaluate the damage that might result if a company were unable to obtain judicial review before disclosure as the court does not have before it any evidence of the effect of such denial.

warning to affected parties before the FTC can disclose confidential data pursuant to congressional request, although we are very sympathetic to the need to protect the owners of valuable trade secrets, *e. g., Underwater Storage, Inc. v. United States Rubber Co.*, 125 U.S.App.D.C. 297, 301, 371 F.2d 950, 954 (1966), *cert. denied*, 386 U.S. 911, 87 S.Ct. 859, 17 L.Ed.2d 784 (1967),—and would allow them to be disclosed only upon valid *formal* requests of Congress or its committees, *see* part V, *infra*—we consider, given no more basis for such an injunction than what is presented here, that no basis exists for us to inject the courts into what is only an incipient controversy.

The authority of the subcommittee to make a proper request for information of the nature that appellants seek to protect is not questioned. The disclosure was not to be used as "exposure for exposure's sake," *see Watkins v. United States*, 354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957), and the subject of the subcommittee's inquiry was one "on which legislation could be had" and thus was a proper topic of Congressional inquiry, *McGrain v. Daugherty*, 273 U.S. 135, 177, 47 S.Ct. 319, 71 L.Ed. 580 (1927); *Braden v. United States*, 272 F.2d 653 (5th Cir. 1959); *Sacher v. United States*, 102 U.S.App.D.C. 264, 252 F.2d 828, *rev'd on other grounds*, 356 U.S. 576, 78 S.Ct. 842, 2 L.Ed.2d 987 (1958). The material that the FTC proposed to divulge, then, was fully within the scope of the legislature's legitimate investigatory powers.

For this court on a continuing basis to mandate an enforced delay on the legitimate investigations of Congress whenever these inquiries touched on trade secrets could seriously impede the vital investigatory powers of Congress and would be of highly questionable constitutionality. While normally reasonable advance notice can be required, in exigent circumstances Congress has full authority to issue forthwith subpoenas and formally request immediate disclosure. To impose a mandatory notice period would skirt dangerously close to being at least the temporary "equivalent to an order quashing [the official request or subpoena] which is generally an impermissible frustration of the congressional power to investigate . . ." *United States v. American Tel. & Tel. Co.*, 179 U.S.App.D.C. 198, 202, 551 F.2d 384, 388 (1976), *citing Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 506, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975) and hence would raise serious constitutional issues. It would also abrogate the broad discretion of the Commission, *e. g., FTC v. Lonning*, 176 U.S.App. D.C. 200, 209, 539 F.2d 202, 211 (1976),—through which the FTC can make use of its considerable expertise to balance the private and public interests involved—to formulate its own reasonable confidentiality protections, *see FTC v. Anderson*, 442 F.Supp. 1118 (D.D.C.1977).[12]

To impose any mandatory advance notice would run directly counter to the spirit expressed in *Eastland v. United States Servicemen's Fund, supra*:

> This case illustrates vividly the harm that judicial interference may cause. A legislative inquiry has been frustrated for nearly five years, during which the Members and their aide [*sic*] have been obliged to devote time to consultation with their counsel concerning the litigation, and have been distracted from the purpose of their inquiry. The Clause [the Speech or Debate Clause] was written to prevent the need to be confronted by such "questioning" and to forbid invocation of judicial power to challenge the wisdom of Congress' use of its investigative authority.

421 U.S. at 511, 95 S.Ct. at 1825.

The inquiry in *Eastland* differed from that in the present appeal,[13] but the deci-

---

**12.** The FTC argues that it would be without authority to resist forthwith subpoenas or formal requests for an immediate response, Brief for FTC at 20. Forthright subpoenas in the areas involved in these cases are certainly a rarity because of the time necessary to gather the information and the speed with which congressional committees function.

**13.** *Eastland* held that the subpoena of certain bank records from organizations being investigated as potentially harmful to the morale of

sion's emphasis on the necessity for courts to refrain from interfering with or delaying the investigatory functions of Congress has an obvious relevance to appellants' demand that we impose a ten day delay on the FTC's compliance with any Congressional request for certain information.

■ Furthermore there is no indication that disclosure to the Subcommittee on Antitrust and Monopoly will in any way harm the appellants. We have heretofore held that release of information to the Congress does not constitute "public disclosure," *Ashland Oil, supra,* 179 U.S.App.D.C. at 24, 548 F.2d at 979; *Exxon v. F.T.C.,* No. 76–0812 (D.D.C. March 29, 1977) at 1. Because such divulgement is not "public," it does not in itself impair the value of the trade secrets involved, and thus does not involve a deprivation prior to which a hearing is required. Thus, the protection of a judicial order, which mandating advance notice would require, is not necessary before such disclosure in order to accord with principles of due process, *see Roth v. Bd. of Regents,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). The courts must presume that the committees of Congress will exercise their powers responsibly and with due regard for the rights of affected parties, *Ashland Oil v. FTC, supra,* 179 U.S.App.D.C. at 24, 548 F.2d at 979, *quoting Ashland Oil v. FTC,* 409 F.Supp. 297, 308 (D.D.C.1976); *see also, Safeway Stores, Inc. v. FTC,* 428 F.Supp. 346, 347

(D.D.C.1977). In sum, we reaffirm our rationale in *Ashland Oil* that absent a showing that it is "evident" that Congress intends to make trade secrets divulged to it by the FTC publicly available, the Commission may, upon proper demand, release such secrets to the Congress without the necessity of prior notice to the parties involved, unless of course the Commission obtained such information upon an agreement to give prior notice to the party.[14]

Our decision in *FTC v. Texaco, Inc., supra,* 180 U.S.App.D.C. at 412, 555 F.2d at 884 in which ten days notice was required by the court with respect to a specific request does not in any way conflict with our refusal here to order a similar general warning period. We do not interpret *Texaco* as authority for establishing such a period as a general requirement for FTC disclosure of trade secrets to Congress. In that case we explicitly stated:

> The Court is *not* herein adopting a rule of general applicability for a 10-day notice provision. It is rather adopting for purposes of this case a proposal for confidentiality *advanced by FTC* . . .

180 U.S.App.D.C. at 412, 555 F.2d at 884 n. 64 (emphasis added). Clearly this court's decision to accept the F.T.C.'s own proposed settlement in a case which—as the district court noted[15]—was distinguishable on its facts from the present one, is not precedent for imposing a ten day rule in the situation before us now. Moreover, we also noted in *Texaco* that *F.C.C. v. Schreiber,* 381 U.S.

---

the armed services was within the "legitimate legislative sphere" and that the Speech or Debate Clause precluded judicial interference with congressional investigations within this sphere.

14. We thus decline to impose on the Commission either an unqualified ten day warning requirement or the more flexible alternative of mandating simply "reasonable prior notice." We have recently held in the specific context of congressional requests for confidential data from the F.T.C. that release to the Congressional Committee is not "public disclosure," *Ashland Oil v. FTC, supra.* Thus, such disclosure does not in itself injure appellants. Furthermore, as a general principle, judicial intervention to prevent potential injury from prospective government misconduct is only justified when such misconduct is imminent, not merely

hypothetical, *Reporters' Committee for Freedom of the Press v. A.T.&.T.,* No. 76–2057 (D.C. Cir. August 11, 1978) at 66, 76–77, citing *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *Allee v. Medrano,* 416 U.S. 802, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974); and *Laird v. Tatum,* 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972). To authorize such supervision as the appellants request would not only do violence to the presumption that congressional bodies will act responsibly, *Ashland Oil v. FTC, supra,* but also would place a significant impediment in the path of governmental investigations of important aspects of our economy.

15. JA 84.

279, 295–296, 85 S.Ct. 1459, 14 L.Ed.2d 383 (1965) made clear that "it is the agencies, not the courts, which should, in the first instance, establish the procedures for safeguarding confidentiality," 180 U.S.App.D.C. at 412, 555 F.2d at 884 n. 62. The Commission has recently issued a notice of proposed rulemaking involving its protection of confidential information, 43 Fed.Reg. 3571 (January 26, 1978).[16] It would be completely inappropriate in light of our interpretation of the *Schreiber* case, and the view we take of our judicial authority, to interfere at this point and impose what in effect would be a general protective order upon the F.T.C., *see also, F.T.C. v. United States Pipe and Foundry Co.*, 304 F.Supp. 1254, 1260 (D.D.C.1969); Gelhorn, *The Treatment of Confidential Information by the Federal Trade Commission: Pretrial Practices*, 36 U.Chi.L.Rev. 113, 126 (1968).

### III

■ Appellants' further contention that prior to disclosure the FTC should obtain assurances that confidential information will not be publicly disclosed unless a majority of the members of the committee or subcommittee vote to do so, deserves only perfunctory discussion. Again, we are sympathetic to appellants' concern for safeguarding highly confidential information worth millions of dollars, but for this court on this record to establish any such requirement would clearly involve an unacceptable judicial intrusion into the internal operations of Congress. Although the courts will intervene to protect constitutional rights from infringement by Congress, including its committees and members, *e. g., Yellin v. United States*, 374 U.S. 109, 143–144, 83 S.Ct. 1828, 10 L.Ed.2d 778 (1963); *Watkins v. United States, supra; United States v. Ballin*, 144 U.S. 1, 5, 12 S.Ct. 507, 36 L.Ed. 321 (1892); *Jordan v. Hutcheson*, 323 F.2d 597 (4th Cir. 1963), where constitutional rights are not violated, there is no warrant for the judiciary to interfere with the internal procedures of Congress, *e. g., Consumers Union of the United States v. Periodical Correspondents Assoc.*, 365 F.Supp. 18, 24 (D.D.C.1973), *rev'd on other grounds*, 169 U.S.App.D.C. 370, 515 F.2d 1341 (1975); *Consumers Union of the United States v. Periodical Correspondents. Assoc.*, 169 U.S.App.D.C. 370, 376–377, 515 F.2d 1341, 1347–1348 (1975). This court cannot assume that Congress will act irresponsibly in regulating or disclosing appellants' trade secrets. Barring the imminence of such disclosure, appellants' constitutional rights are not in fact jeopardized by delivery of their secrets to Congress. On this record there is no justification for this court to interfere with the operations of the legislative branch, *see, Frothingham v. Mellon*, 262 U.S. 447, 488, 43 S.Ct. 597, 67 L.Ed. 1078 (1923); *Decatur v. Paulding*, 39 U.S. (14 Pet.) 497, 10 L.Ed. 559 (1840); *Protestants and Other Americans for Separation of Church and State v. O'Brien*, 272 F.Supp. 712 (D.D.C.1967).

■ It would exceed our jurisdiction for this court to require guarantees of specific congressional procedures in advance of any concrete threat to appellants' vital interests. The strong and long-standing principle of judicial abstention into the actions of the legislature demands that the courts, "avoid the possibility of unwarranted interference with a coordinate branch of government, by requiring dismissal of applications [seeking to restrain congressional committees' use of information] not substantiated by a showing of need arising out of immediate threats to constitutional rights," *Cole v. McClellan*, 142 U.S.App.D.C. 24, 25, 439 F.2d 534, 535–536 (1970); *e. g., Davis v. Ichord*, 143 U.S.App.D.C. 183, 442 F.2d 1207 (1970). Courts should refrain from creating "needless friction" with a coordinate branch of government, *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496, 500, 61 S.Ct. 643, 85 L.Ed. 971 (1941); *Ansara v. Eastland*, 143 U.S.App.D.C. 29, 31, 442 F.2d 751, 753 (1971), and imposing a particular voting require-

---

**16.** The proposed rules provide that, in response to congressional requests for confidential data, "ten days notice shall be given *where possible*" (emphasis added), 43 Fed.Reg. 3574 (January 26, 1978). It would seem that the rule should provide that in all instances the party will be notified immediately whenever Congress makes a proper request for trade secrets.

ment to operate in the manner of a Congressional Rule, on the grounds that such a safeguard is necessary to ensure that Congress will act responsibly with secrets entrusted to it, is not only not refraining from, but actually provoking such "needless friction." The FTC and this court are compelled to rely on the assumption that Congressional committees will act responsibly with confidential data revealed to them, *Ansara v. Eastland, supra,* 143 U.S.App. D.C. at 32, 442 F.2d at 754; *Ashland Oil v. F.T.C.,* 409 F.Supp. 297, 308 (D.D.C.), *aff'd,* 179 U.S.App.D.C. 22, 548 F.2d 977 (1976).

▮ If, in fact, a Member or congressional staff member improperly "leaks" confidential data, the injured parties have a recourse against that individual directly,[17] and the possibility of such action will serve to deter unjustified disclosure of trade secrets. Beyond provision for such suits, and in the absence of a concrete violation of law, rule or regulation, the courts are unable to aid the appellants in their request to oversee the activities of the legislature, allegations of the prevalence of "leaks" from some committees notwithstanding. The FTC should, and does, alert Congress when the information made available to it is confidential. In fact, some such cautionary statement could be impliedly required from the prohibition on the public disclosure of trade secrets imposed by 15 U.S.C. § 46(f). If the Commission failed to alert Congress to the fact that information being supplied to it was by statute prohibited from "public" disclosure the Commission would violate a duty implicitly imposed upon it by the statute. To impose further protective procedures upon Congress, without some immediate threat of illegal disclosure, would impermissibly interfere with the legislative branch—an action we refuse to take.

## IV

▮ Appellants also ask this court to require the FTC precisely to ascertain that the Congress specifically desires access to trade secrets, not merely more general (and less confidential) data, before it divulges such information. Of course, the FTC should not simply disclose trade secrets to Congress "sua sponte." The Commission, however, will invariably know the nature of the information in its possession far more accurately than Congress, and oftentimes may be aware of data clearly pertinent to an investigation of which Congress has no knowledge or intimation. We would not restrict the right, prior to congressional demand of the Commission to discuss with Members of Congress or their staff the general nature of available data and thus use its expertise to inform the legislature of relevant information of which the Congress may often be unaware.[18] Barring some prohibition, governmental agencies may interchange information. Most problems in this connection will be obviated if the Commission merely notifies Congress whenever confidential trade secrets are requested or involved in potential delivery. In III, *ante,* we noted the obligation of the Commission to do this.

## V

▮ It is important to emphasize that our denial of appellants' requested injunc-

---

**17.** An official or employee of the Commission *who makes an unauthorized public disclosure of confidential information* may be guilty of a misdemeanor, *see* 16 C.F.R. § 4.10(c); *see also,* 12 Von Kalinowski, Trade Regulation § 89.04[2] at 89–33 (1977).

**18.** Imposing a general restriction on the FTC's ability to assist Congress in the latter's investigations would be unjustified particularly in light of the fact that the Commission was formed in part to act as an arm of the legislature, assisting Congress in its investigations. A member of the Conference Committee on the bill that originally established the F.T.C., Congressman Stevens, explained that:

[The Commission] has the power to investigate for the benefit of Congress. It really performs the functions of a committee of Congress in the line of investigation and compilations and recommendations. It can ascertain all the facts, as we constitutionally have the power to do, or we can commit that power to a Commission or to a committee to do that. That is what we do in this case. It is an especially valuable function, and its beneficial work will be along the line of recommendation to Congress and the President. 51 Cong.Rec. 14935 (1914).

tive and declaratory relief designed to limit the manner in which the F.T.C. may *respond* to a subpoena or formal request issued by Congress, does not address the question of when such a request or subpoena has been *properly issued*. While we are unable to agree with appellants' request for advance restrictions on the Commission's response to formal requests or subpoena, we feel that there is ample justification for insisting that the Commission only reveal statutorily protected *trade secrets* when it has indeed received such a proper request or subpoena.

■ There is no doubt that the subpoena power may be exercised on behalf of Congress by either House, *Eastland v. United Servicemen's Fund, supra; see* 2 U.S.C. § 190b(a) (1976); House Rule XI cl. 2(A), and that the subpoenas issued by committees have the same authority as if they were issued by the entire House of Congress from which the committee is drawn, *e. g., In Re Motion to Quash Subpoenas and Vacate Service*, 146 F.Supp. 792, 794 (W.D. Pa.1956). To issue a valid subpoena, however, a committee or subcommittee must conform strictly to the resolution establishing its investigatory powers, and only those parties expressly authorized to sign subpoenas may do so validly. For example, where the resolution granting subpoena power to a committee stated that subpoena would be issued only by the whole committee, not even the Chairman himself could individually issue such a document, *Liveright v. United States*, 120 U.S.App.D.C. 379, 347 F.2d 473 (1965); *see also, Shelton v. United States*, 117 U.S.App.D.C. 155, 327 F.2d 601 (1963).

The resolution which in *Liveright* was held not to justify the Chairman's issuing a subpoena by himself is nearly identical to that of 2 U.S.C. § 190b(a) governing the subpoena power of Senate committees and subcommittees. The resolution specified that "the committee or any duly authorized subcommittee thereof is authorized . . to require by subpoena." Whereas. the statute states that "[e]ach standing committee of the Senate, including any subcommittee of any such committee, is authorized . . to require by subpoena or otherwise." The clear intent of 2 U.S.C. § 190b(a), is that only *committees* or *subcommittees* can issue subpoenas in the name of the committee or subcommittee, and *Liveright* indicates how narrowly the number of persons entitled to issue subpoenas is to be interpreted.

■ The purposes behind the limitation on the members of a committee or subcommittee who may issue subpoenas in its name is illuminated by the House Rule on this subject:

A subpena may be authorized and issued by a committee or subcommittee under subparagraph (1)(B) in the conduct of any investigation or series of investigations or activities, *only when authorized by a majority of the members voting, a majority being present.* The power to authorize and issue subpenas under subparagraph (1)(B) may be delegated to the chairman of the committee pursuant to such rules and under such limitations as the committee may prescribe. Authorized subpenas shall be signed by the chairman of the committee or by any member designated by the committee.

Rule XI cl. 2(m)(2)(A) Manual and Rules of the House of Representatives, 95th Congress (emphasis added).[19] This rule is plainly directed at eliminating the possibility that an individual member of a committee will—solely on his own initiative—issue a "subpoena" compelling production of evidence, and a similar purpose can be discerned in 2 U.S.C. § 190b(a). The principle

---

19. The reform rule adopted by the 94th Congress required subpoenas to be "authorized by a *majority of th* ⸍ *members of the committee* . . ." *Id.,* cl. 2(m) (emphasis added). *See Ashland Oil, Inc. v. FTC*, 179 U.S.App.D.C. 22, 30–36, 548 F.2d 977, 985–991 (1976). The reform, however, was short lived, as the 95th Congress changed the rule to only require "a majority of the members voting, a majority being present."

The Senate rule authorizes "[e]ach standing committee . . . including any subcommittee of any such committee . . . to require by subpoena or otherwise the attendance of such witnesses and the production of such . . documents [etc.] . . . as it deems advisable." Rules and Manual of the United States Senate, 95th Congress, § 190b.(a), p. 363 (1977).

is important that disclosure of information can only be compelled by authority of Congress, its committees or subcommittees, not solely by individual members; and only for investigations and congressional activities. Election to the Congress does not give an individual subpoena power over whatever information he may happen to be interested in, and particularly not over trade secrets, whose oftentimes enormous value may be forfeited by disclosure to the public.

■ Although once a committee or subcommittee has in fact requested trade secret information, the separation of powers demands that the courts do little to interfere with how the Congress deals with this information; it is only when a formal committee or subcommittee request, or request by the committee chairman pursuant to an authorized investigation or activity, has been made that the doctrine of separation of powers becomes relevant at all. And as Congress itself has manifested a concern to prevent the issuance of subpoenas by individual members as opposed to committees, subcommittees or duly authorized committee chairmen, it is appropriate to require the FTC to take steps to ascertain the validity of a subpoena (or the formal requests it treats as subpoenas) before it releases data it is required by statute to be kept confidential.

■ Since the Freedom of Information Act makes a great deal of information available to the public and the FTC may volunteer certain *ordinary information* without any formal request, there does not seem to be any need for requiring the F.T.C. to determine whether or not a request for such information is in fact a proper formal request or subpoena. However, *trade secrets* are explicitly excluded from that material which the Commission may in its good discretion "make public." 15 U.S.C. § 46(f), *supra. See Bristol-Myers Co. v. FTC*, 138 U.S.App.D.C. 22, 25, 424 F.2d 935, 938, *cert. denied*, 400 U.S. 824, 91 S.Ct.

46, 27 L.Ed.2d 52 (1970). We thus note that Congress intended to prohibit the FTC from disclosing "trade secrets" and cannot therefore assume that it meant to allow divulgement of these secrets upon the casual request of individual Congressmen.[20] Accordingly, although we do not require the FTC to observe the procedures proposed by the appellants to limit the manner in which the Commission responds to *formal requests* for trade secrets from Congress or its committees it is nothing more than common sense for the FTC to not disclose trade secrets except upon legally authorized requests therefore and to verify that fact before delivery. Trade secrets, by statute, are in a different position than ordinary non-confidential information within the possession of the Commission.

■ In this particular appeal, it does not clearly appear that the request sent to the FTC by Senator Hart was a "formal request" authorized by the subcommittee. The Commission, however, may have been previously informed of subcommittee action that satisfied the necessary formalities. The Senate rules empowered the Chairman of the Subcommittee on Anti-Trust and Monopoly to issue subpoenas for proper purposes authorized by the subcommittee, and the requests presented to the FTC in this case were signed by Senator Hart, on official stationery and asked that "the Commission make available to the *Subcommittee* that data which it has gathered on coal and uranium reserves." (Emphasis added). When the Commission receives such a letter and it has knowledge that said investigation has been duly authorized, it is reasonable of it to treat it as an authorized formal request. Had Senator Hart himself written in a capacity other than that of Subcommittee Chairman, or had some other senator on the committee requested the confidential data, however, the statutory protection due to confidential trade secrets in the hands of the Commission, *see* 15 U.S.C. § 46(f); *FTC*

---

20. We note that, in another context, Congress has manifested its solicitude to protect the interests of those individuals who are forced to entrust confidential data to agencies, *see, e. g.*, H.R.Rep. No. 1497, 89th Cong., 2d Sess. 6 (1966) (a report on the bill that became the Freedom of Information Act of 1967); *see generally*, Note, Reverse-Freedom of Information Act Suits: Confidential Information in Search of Protection, 70 Nw.U.L.Rev. 995 (1976).

*v. Texaco, Inc., supra*, 170 U.S.App.D.C. 323 at 337, 517 F.2d 137, at 151, demands that it not release such sensitive information without verifying that the request satisfies the requirements of the controlling congressional rule.

## VI

 As a final point, the fact that appellants are appealing from the district court's refusal to grant equitable relief places an exceptionally heavy burden on them if they are to succeed before this court. Not only does an appeal from a denial of injunctive relief require a showing that the trial court abused its discretion, *Public Affairs Associates, Inc. v. Rickover*, 369 U.S. 111, 112, 82 S.Ct. 580, 7 L.Ed.2d 604 (1962); *Hecht Co. v. Bowles*, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944); *Meredith v. City of Winter Haven*, 320 U.S. 228, 235, 64 S.Ct. 7, 88 L.Ed. 9 (1943); *Independent Bankers Assoc. of America v. Smith*, 175 U.S.App.D.C. 184, 534 F.2d 921, *cert. denied*, 429 U.S. 862, 97 S.Ct. 166, 50 L.Ed.2d 141 (1976), but also the burden on these particular appellants is considerably heightened by the clear public interest in maximizing the effectiveness of the investigatory powers of Congress. The welfare of the public is a factor to be weighed in determining whether or not to issue an injunction, *e. g., Yakus v. United States*, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944); *Hecht Co. v. Bowles, supra; Harrisonville v. W. S. Dickey Clay Mfg. Co.*, 289 U.S. 334, 53 S.Ct. 602, 77 L.Ed. 1208 (1933); *United States v. American Tobacco Co.*, 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663 (1911), and the investigatory power is one that the courts have long perceived as essential to the successful discharge of the legislative responsibilities of Congress, *McGrain v. Daugherty, supra.*

 It would, then, require an extremely strong showing by the appellants to succeed in obtaining an injunction in light of the compelling public interest in denying such relief. Furthermore, there is no significant private injury present here to weigh against the public interest in unimpeded congressional investigation, *see Ohio Oil Co. v. Conway*, 279 U.S. 813, 49 S.Ct.

256, 73 L.Ed. 972 (1928); 7 J. Moore, Federal Practice ¶ 65.18[3] at 65–138. Given the presumption of congressional propriety discussed above, *see also, Ansara v. Eastland, supra*—there is no risk of imminent injury to appellants. Injunctions, however, will not issue to prevent injuries neither extant nor presently threatened, but only merely "feared," *Connecticut v. Massachusetts*, 282 U.S. 660, 51 S.Ct. 286, 75 L.Ed. 602 (1931). To grant the injunction appellants request, this court would be required to interfere with the operation of Congress, and also to depart from traditional doctrine concerning the availability of equitable relief. Finding no justification for granting the relief requested by appellants, we affirm the judgment of the district court in its entirety.

*Judgment accordingly.*