**PEOPLE OF the STATE OF ILLINOIS ex rel. William C. HARRIS, Commissioner of Banks and Trust Companies of the State of Illinois, Plaintiffs,**

v.

**BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM and Federal Reserve Bank of Chicago, Defendants,**

**and**

**House Committee on Banking, Finance, and Urban Affairs, Intervenor–Defendant.**

No. 90 C 6863.

United States District Court, N.D. Illinois, E.D.

Jan. 3, 1991.

Roger Philip Flahaven, Illinois Atty. Gen. Office, Chicago, Ill., for plaintiffs.

Nancy K. Needles, U.S. Attorney's Office, Chicago, Ill., for defendants.

Thomas Keith McQueen, Jenner & Block, Chicago, Ill., for intervenor-defendant.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

Congress, or, more specifically, the House Committee on Banking, Finance, and Urban Affairs (the Committee), is investigating its current procedures and regulations governing foreign ·banks doing business in the United States. The investigation was prompted, at least in part, by the disclosure of the fact that an American branch (located in Atlanta) of the Italian Banca Nazionale del Lavoro (BNL) had approved over three billion dollars in "secret and unauthorized loans" to Iraq. See Opening statement of Henry B. Gonzalez, Chairman, Committee on Banking, Finance and Urban Affairs, cited in House Memorandum in Support of House Motion to Dismiss and in Opposition to Plaintiffs' Motion for Preliminary Injunction at 3.

As part of its investigation, the Committee requested and then subpoenaed various records from the Board of Governors of the Federal Reserve (Board). Among the records subpoenaed are records compiled by state agencies charged with conducting bank examinations. The Board is permitted, indeed required, to make arrangements with those state agencies to share the information gathered from those examinations. See 12 U.S.C. § 3105(b)(1) ("[t]he Board shall, insofar as possible, use the reports of examinations made by ... the appropriate State bank supervisory authority for the purposes of this subsection.")

One of the states which has conducted examinations of BNL is Illinois, through the office of William C. Harris, the Commissioner of Banks and Trust Companies of the State of Illinois (the court will refer to the plaintiffs collectively as "Harris" or "Illinois"). Harris and the Board have an information-sharing agreement, memorialized in a document entitled "Agreement on Sharing Confidential Supervisory Information". That agreement provides, in part, that the Board will not disclose state information "to any other state, local, or federal agency, court or legislative body, or any other agency, instrumentality, entity, or person without the express written permission of the agency that provided the information."

Harris believes that the agreement precludes disclosure by the Board to *anyone*, including the Committee. He therefore filed a motion for a temporary restraining order and preliminary injunction, seeking to prevent disclosure. This court granted a temporary restraining order in order to preserve the status quo, and to give this court an opportunity to consider the important and fascinating issues presented by this conflict.

When the parties first came before the court, the court ordered them to preserve the status quo until it had an opportunity to rule on the motion for temporary restraining order. The next time the parties appeared before the court, the court held that the Committee "subpoena", issued after the House had adjourned *sine die*, was invalid. This court nonetheless allowed the Committee (or, more accurately, the Committee staff) to intervene, as the Committee staff, with or without the subpoena, had asserted a legitimate legislative interest in the documents. The court noted, however, that the interest was sharply limited by the fact that the House, which is not a continuing body, was not in session.

Shortly thereafter, the court entered a temporary restraining order, and set an expedited briefing schedule for the preliminary injunction. The court did not schedule a hearing because the parties represented that the dispute presented a purely legal question, hence there was no need for a factual hearing. A multitude of briefs have now been filed (about which more later) and this court has considered them as well as the oral arguments of the parties, and in light of them, and its own interpretation of the relevant law, this court grants Harris' motion for a preliminary injunction.

### 1. The Stakes

This dispute has placed the court squarely in the center of a rare and portentous clash between two governmental entities, each asserting its own "sovereignty" or power over the matter in issue. The court

is well aware of the need to tread carefully in its attempt to resolve a dispute of this dimension between two such entities. The court turns first to the questions of jurisdiction and justiciability.

The case presents a "federal question", calling as it does for an interpretation of federal laws and possibly the Constitution; it involves a contract with the United States; and the plaintiff seeks "to compel an officer of the United States to perform [what the plaintiff alleges to be] his duty". Jurisdiction in this court is therefore proper pursuant to 28 U.S.C. §§ 1331, 1346 and 1361.

As to justiciability, neither the Committee staff nor the Board has argued that this case presents a non-justiciable "political question", see *Baker v. Carr*, 369 U.S. 186, 208–211, 82 S.Ct. 691, 705–707, 7 L.Ed.2d 663 (1962), and so this court need not venture down that thorny path. See *Robbins v. Lady Baltimore Foods, Inc.*, 868 F.2d 258, 262 (7th Cir.1989), and cases cited therein ("[i]t is well established that federal courts must not rule on constitutional issues where other, non-constitutional dispositive grounds are available.") The Committee staff, rather than argue that the question presented here is non-justiciable, merely asserts its right to success on the merits,[1] while the Board, appropriately as a "neutral stakeholder", has not argued for a particular outcome.

The first question presented to this court, then, is whether the contract between Harris and the Board prohibits the Board from making Harris' documents available to the Committee staff. If so, then the issue is whether it is enforceable against an investigatory interest on the part of a federal legislative body, unaccompanied by a valid subpoena. If the contract does not prohibit disclosure of the documents in issue here, then this court must still decide whether the interest Harris has asserted in the documents overcomes the legislative interest described above.

Before addressing the merits, however, this court is compelled to comment on two procedural matters. First, the court must voice its concern with the Committee staff's failure (at least seven times, by this court's count) to comply in letter or spirit with this court's rulings and with this district's local rules. The Committee counsel made his initial appearance in this court without having entered an appearance as required by Local Rule 3.14(b). Committee counsel proceeded to breach various other rules, including the rule requiring designation of local counsel, Rule 3.13, despite this court's repeated admonitions that compliance with the rules in general, and designation of local counsel in particular, was required. Rather than adhere to this court's admonitions, however, Committee counsel came into this court like an eight-hundred pound gorilla, expecting deference from the court while refusing to respect the court's orders and admonitions.[2] This court has warned the Committee staff, and does so again now, that it will not continue to tolerate such blatant disregard for its orders.

There is another problem with some of the briefs submitted in this matter. In its response in opposition to the motion for preliminary injunction, and in favor of its motion to dismiss, the Committee staff refers to an affidavit by Briget Polichene,

---

1. The important question which exists here would have been far better presented had the Committee simply subpoenaed the documents from *Harris* rather than the Board, but this the Committee has flatly refused to do, for no reason that this court can discern other than that the Committee seeks this court's assertion that the Committee's authority extends to *any* documents possessed by the Board, from whatever source derived.

2. As an example, the Committee attempted to file, without having first sought leave to do so, a brief in excess of the fifteen-page limit permit-

ted by local rules. When this court declined to permit a brief in excess of the limit (in part because the Committee failed to timely request leave to file it), the Committee merely shifted some text to footnotes in order to comply in fact, but not in spirit, with the court's ruling. In its most recent brief, the Committee adhered to the fifteen-page limit, but included twenty footnotes, many of them containing substantive argument, and attached an affidavit which also contained legal argument. Even now, review of the common law docket reflects no appearance by Committee counsel.

Deputy General Counsel of the Committee. Ms. Polichene's affidavit contains legal argument, which is not appropriately presented by affidavit, and raises a factual dispute as to the Board's interpretation of the contract in issue. More specifically, Ms. Polichene states that she had a conversation with the Board's General Counsel about the interpretation of the contract and then proceeds to "paraphrase ... and spell it out" for the court. Supplemental Declaration of Briget Polichene affidavit, par. 9. Not surprisingly, the Board's General Counsel disputes Ms. Polichene's rendition of the conversation. So, predictably, the Board filed a reply attaching its own affidavit setting forth its version of the facts. Just as predictably, the Committee staff filed a surreply, with yet another affidavit.

Certainly the Committee staff must have known that the conflicting affidavits presented a question of fact which could not be resolved without a hearing. This court need not speculate, however, as to whether the Committee staff was attempting to delay the court's ruling in this matter until after the House reconvenes in early January (at which time the Committee could issue a valid subpoena), since the facts which have been put in issue are simply not material. The Board's interpretation of the contract it entered with Harris is informative to the court, but not dispositive. Ms. Polichene's understanding of the Board's interpretation of the contract and pertinent statutory provisions is both incompetent and irrelevant evidence. Accordingly, the court strikes those portions of Ms. Polichene's affidavit which contain legal argument, or which represent the contents of a conversation with Board General Counsel regarding the interpretation of the contract. The court also strikes the affidavit submitted by the Board in response to those portions of Ms. Polichene's affidavit.

### 2. Interpretation of the Contract

The contract is brief, and fairly straightforward. The parties have raised two issues in relation to it—first, that it applies, on its face, to "bank holding companies and state member banks", *not* to branch offices of foreign banks. The second issue is the effect of 12 C.F.R. § 261.12 on the interpretation of the contract. This court will address each issue in turn.

### a. Whether the agreement covers the BNL documents

Although the contract, on its face, does not apply to the BNL documents which Harris shared with the Board (BNL is neither a bank holding company nor a state member bank), in practice, the parties agree that the Board has applied the same confidentiality standards to documents regarding foreign banks as it has to the banks specifically covered by the contract. The question then is whether the contract has been legally enlarged to cover the BNL documents.

The parties have not offered any opinion to this court as to what law applies to the interpretation of the contract. To the extent there is a conflict among the states whose laws might apply, this court, as a federal court sitting in the state of Illinois, is required to apply Illinois law in resolving the conflict. See *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 495–96, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). Illinois chooses the law of the state of execution and performance of the contract for disputes about the interpretation of the contract. *Oakes v. Chicago Fire Brick Co.*, 388 Ill. 474, 58 N.E.2d 460 (1944); *Boise Cascade Home & Land Corp. v. Utilities, Inc.*, 127 Ill.App.3d 4, 468 N.E.2d 442, 82 Ill.Dec. 180 (1st Dist. 1984). This contract was executed and performed in Illinois, hence, this court will apply Illinois law to the question whether the contract was enlarged.

Illinois does permit parol modification of written contracts. *South Shore Amusements, Inc. v. Supersport Auto Racing Ass'n*, 136 Ill.App.3d 284, 483 N.E.2d 337, 91 Ill.Dec. 55 (1st Dist.1985) (parties to a written contract may alter or modify its terms by subsequent oral agreement) *Monarch Coaches, Inc. v. ITT Industrial Credit*, 818 F.2d 11 (7th Cir.1987) (oral modification of a contract not involving the sale of goods is enforceable under

common law). The question whether an oral modification exists is one of fact. *South Shore Amusements*, 136 Ill.App.3d at 287, 483 N.E.2d 337, 91 Ill.Dec. 55. Here, Harris and the Board agree that their practice was to treat examination reports relating to foreign banks in accordance with the terms of the written contract. This court therefore concludes that the parties modified the contract to bring within its terms examination reports about foreign banks such as BNL.

So, the contract applies to the BNL reports. But what does that mean? Is a contract between the Board, a federal executive agency, and the State of Illinois which prohibits disclosure of information by production of documents which are the property of the State of Illinois "to any ... state, local, or federal agency, court or legislative body ... without the express written permission of the agency that provided the information" enforceable against the United States Congress? Or is there a way to construe the contract so that it does not infringe on Congress' investigatory powers? Before answering these questions, there is one more piece of the puzzle which this court must examine—that is, the interplay of the federal regulations which govern the Board's ability to keep confidential certain information.

b. Application of the Federal Regulations

The parties have raised a question about the meaning and application of a federal regulation on the terms of the contract. Before discussing the specifics of the contract and regulation, however, some background is necessary. The Board is authorized by statute to collect information about banks doing business within the United States. 12 U.S.C. § 3105(b)(1). It is required, to the extent possible, to use the information gathered by state regulatory boards in fulfillment of its duty to monitor the banks. *Id.* To that end, the Board enters "sharing" agreements with

various states. It appears that the Board has used a standard form for at least some of those agreements, including the one with Illinois. (see exhibit 3 to Committee response filed on Dec. 20, 1990).

The Committee staff implies (and occasionally baldly states) that these statutes mean that the states are performing a federal function when they conduct their own examinations of banks in which the Board has an interest. That is simply not a reasonable inference from the facts. Illinois has created the office of Commissioner of Banks and Trust Companies to perform a variety of functions, including conducting examinations of banks in Illinois. Ill.Rev. Stat. ch. 17, par. 359(2) (1990).[3] Clearly, Harris does not share his examination reports with the Board because he must, but rather because he gains some advantage from doing so (the contract contemplates mutual sharing of examination reports). The fact that Harris and the Board share their investigatory reports does not mean that either party ever relinquishes ownership of the reports. In fact, the contract specifically provides that ownership remains with the party that conducted the examination, but more on that later.

The contract specifically incorporates a federal regulation governing the availability of information held by the Board:

The requesting agency specifically agrees to be bound by the same standards of confidentiality and other limitations and conditions respecting the use of any such data received from the responding agency as specified by ... (12 C.F.R. § 261).

The very next paragraph of the contract provides:

The requesting agency acknowledges that all confidential supervisory information, in whatever form, furnished by the responding agency remains the property of the responding agency and agrees that no further disclosure of such infor-

---

**3.** The statute specifically provides that: "Nothing contained in this Act shall be construed to limit the obligation relative to examinations and reports of any State bank, deposits in which are to any extent insured by the United States or any agency thereof, nor to limit in any way the powers of the Commissioner with reference to examination and reports of such bank." Ill.Rev. Stat. ch. 17, par. 359(4).

mation shall be made to any other state, local, or federal agency, court or legislative body, or any other agency, instrumentality, entity, or person without the express written permission of the agency that provided the information.

The relevant portion of the regulation incorporated by the contract provides:

261.12(a) Upon written request, the Board may make available to appropriate law enforcement agencies and to other nonfinancial institution supervisory agencies for use where necessary in the performance of official duties, reports of examination and inspection,[4] confidential supervisory information,[5] and other confidential documents and information of the Board concerning banks, bank holding companies and their subsidiaries, U.S. branches and agencies of foreign banks, and other examined institutions.

\*     \*     \*     \*     \*     \*

(e) The Board's General counsel shall review and may approve the disclosure of confidential information pursuant to Federal and state grand jury, criminal trial, and government administrative subpoenas. The General Counsel may impose such conditions or limitations on disclosure under this section that the General Counsel determines are necessary to effect the purposes of this regulation, to insure compliance with applicable laws or regulations or to protect the confidentiality of the Board's information.

The Committee staff would have this court hold that, by referring to the regulation, the contract adopts the confidentiality procedures set forth there, and no others. Alternatively, the Committee staff argues that no additional confidentiality safeguards are legally permissible. The court will address each argument in turn.

### (1) Adoption of regulation

■ The argument that because the contract refers to § 261 all other provisions within the contract regarding confidentiality are meaningless is invalid. A court construing a contract (again, turning to Illinois law on this matter) is bound to give meaning to each word of the contract. *In re Halas*, 104 Ill.2d 83, 470 N.E.2d 960, 83 Ill.Dec. 540 (1984). The intent of the parties to a contract should be determined with reference to the contract as a whole, not merely by reference to particular words or isolated phrases. *Shelton v. Andres*, 106 Ill.2d 153, 478 N.E.2d 311, 87 Ill.Dec. 954 (1985); *La Throp v. Bell Federal Savings & Loan Ass'n*, 68 Ill.2d 375, 370 N.E.2d 188, 12 Ill.Dec. 565 (1977).

■ This court cannot simply ignore the language of the contract which imposes stricter confidentiality standards than those provided by § 261. The next question, then, is whether the stricter standards are superseded by § 261.

### (2) Effect of § 261

The question whether Congress intended the regulation to provide the exclusive terms of any confidentiality agreement must be answered with reference to the words of the regulation. Quite clearly, the answer is no. Section 261.12(a) provides that the Board *may* make confidential information available to appropriate agencies. That language simply cannot be reasonably construed as prohibiting the Board from entering stricter or more comprehensive confidentiality agreements.

For all these reasons, this court finds that the contract between Harris and the Board (1) applies to the BNL reports; and (2) is not limited to the confidentiality provisions of 12 C.F.R. § 261. This court is therefore faced, finally, with the question whether Harris can hold the Board to the terms of the contract in the face of a legitimate Congressional investigatory in-

---

4. "Reports of examination" includes "reports of examination of other financial institutions prepared and provided to the Federal Reserve System by other Federal and state financial institution supervisory agencies." 12 C.F.R. § 261.2(e)(2).

5. Confidential supervisory information "may consist of documents prepared by, on behalf of, or for the use of the Board, a Reserve Bank, a Federal or state financial institutions [sic] supervisory agency, or a bank or bank holding company." 12 C.F.R. § 261.2(b).

terest, albeit one weakened by the fact that the House is not currently in session.

### 3. Enforceability of the Contract

■ Although the instances are rare (or at least rarely reported in the casebooks), Harris is not the first person to attempt to resist a Congressional subpoena directed against a third party. A review of other cases addressing similar problems may be useful at this juncture.

Perhaps the best place to start is with an examination of the origin and scope of Congress' investigatory power. The Constitution vests all legislative power in the Congress, and authorizes the Congress to, among other things, "make all Laws which shall be necessary and proper for carrying into Execution" the powers vested in Congress by the Constitution. It is well settled that "the power of inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative function." *McGrain v. Daugherty*, 273 U.S. 135, 174, 47 S.Ct. 319, 328, 71 L.Ed. 580 (1927). This interpretation is sensible because "[a] legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change; and where the legislative body does not itself possess the requisite information—which not infrequently is true—recourse must be had to others who do possess it." *Id.* at 175, 47 S.Ct. at 329. Query: does the fact that Congress has "the power of inquiry" make its right to the information sought absolute?

Most often when Congress or one of its committees requests or subpoenas information the person affected by the subpoena can resist it by refusing to comply, and facing a contempt citation and the resulting proceedings. See 2 U.S.C. § 192 (1938). The issue is complicated when, as here, documents owned by one person or entity are held by, and subpoenaed from, another. The owner of the documents, and, ostensibly, the one who will be harmed by their disclosure, has no recourse to a contempt proceeding, because it has no power over the disclosure of the documents.

In *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975), the court was presented with a conflict between a Senate subcommittee and a private organization. The subcommittee subpoenaed the organization's records from its bank. The organization sought to enjoin implementation of the subpoena. The court held that because investigation pursuant to which the subcommittee had issued the subpoena fell within the "legitimate legislative sphere" the court could not interfere with it. The fact that the court's refusal to enjoin the subpoena and the subcommittee's refusal to subpoena the organization directly left the organization with no recourse against the subpoena was simply not sufficient to overcome the subcommittee's legitimate legislative interest.

Similarly, in *U.S. v. American Telephone & Telegraph Co.*, 551 F.2d 384 (D.C. Cir.1976) the court refused to interfere in a clash between the executive and legislative branches. In that case, a House subcommittee subpoenaed telephone records relating to wiretaps conducted by the United States Justice Department. The court in that case refused to rule on the question but rather set forth "the outlines of a possible settlement which may meet the mutual needs of the congressional and executive parties without requiring a judicial resolution of a head-on confrontation...." *Id.* at 385. The court noted, however, the exceptionally strong presumption in favor of a legitimate legislative interest, and suggested that it could be overcome only by a showing that disclosure would jeopardize "'military, diplomatic or sensitive national security secrets....'". *Id.* at 391, citing *U.S. v. Nixon*, 418 U.S. 683, 706, 94 S.Ct. 3090, 3106, 41 L.Ed.2d 1039 (1974).

The court expressly balanced the third party's need for confidentiality with Congress' legitimate investigatory interest in certain information in *Exxon Corp. v. F.T.C.*, 589 F.2d 582 (D.C.Cir.1978). The dispute there involved a congressional request for documents held by the F.T.C., but belonging to Exxon Corp. The court, citing its earlier ruling in *Ashland Oil, Inc. v. F.T.C.*, 548 F.2d 977 (D.C.Cir.1976), held

that "the courts must presume that the committees of Congress will exercise their powers responsibly and with due regard for the rights of affected parties." *Exxon* at 589. Thus, "absent a showing that it is 'evident' that Congress intends to make [confidential information] divulged to it . . . publicly available" the third party has no right to injunctive relief blocking the disclosure of the information to Congress.

The lesson of all these cases is that a confidentiality interest on the part of the owner of the documents is not enough to prevent their disclosure to Congress pursuant to a legitimate legislative interest. If Harris is to prevail, he must demonstrate to this court that his interest, and the interest of the sovereign state of Illinois, overcomes whatever interest the Committee staff has in the disputed documents. The battle here turns precisely on the question whether a state which owns documents in the possession of another, has the right to enforce a contract which would prevent the other from disclosing those documents pursuant to the legitimate interest of a body which, at the moment, does not exist.

This court has already held that the Committee subpoena for the disputed records is invalid. The same circumstance which has made the subpoena invalid, that is, the adjournment *sine die* of the House of Representatives, greatly weakens the Committee staff's legislative interest in the documents.[6] The court now turns to the balance between the Committee staff's interest and Illinois' right to control its property.

Illinois is a sovereign state. These are not empty words, they invoke deep constitutional significance. The state's power is not unfettered, it is limited by Article 1, § 10 of the Constitution as well as by the Supremacy clause. The Committee staff has invoked neither here. The Supreme Court has only recently held that "under our federal system, the States possess sovereignty concurrent with that of the Federal Government, subject only to limitations imposed by the Supremacy Clause." *Tafflin v. Levitt*, —— U.S. ——, 110 S.Ct. 792, 107 L.Ed.2d 887 (1990). Although one could never tell it from the Committee staff's briefs, Harris is not a minion of the Board, scurrying here and there to carry out investigations at the Board's behest who now, ungratefully, bites the hand that feeds him by requesting the opportunity to defend what is his. Rather, he is an officer of the State of Illinois, carrying out the duties imposed upon him by his office. This court will not deprecate that role.

As this court has explained, confidentiality interests, standing alone, are not an adequate reason to thwart a Congressional inquiry. See *Exxon Corp. v. F.T.C.*, 589 F.2d 582 (D.C.Cir.1978); *Ashland Oil, Inc. v. F.T.C.*, 548 F.2d 977 (D.C.Cir.1976) (the courts must presume that the committees of Congress will exercise their powers responsibly and with due regard for the rights of affected parties). But Harris has asserted more than a mere confidentiality interest here. He has asserted the right of a sovereign state to control its own property. This case is not analogous to *U.S. v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, where the Supreme Court refused to quash a subpoena directed to the president of the United States. No one has subpoenaed Harris. He is merely asking for his property back so that, should a subpoena issue, it will be directed to the owner of the documents. Thus, he will have the opportunity to resist the subpoena through the channels which have been provided by Congress, namely, 2 U.S.C. § 192. His request is reasonable, it is made on behalf of a state with sovereignty "concurrent with that of the Federal Government" and it must overcome the weak interest asserted by the Committee staff.

The court notes that the preferred resolution for this matter would have been a settlement. See *U.S. v. American Tel. & Tel. Co.*, 567 F.2d 121, 127 (D.C.Cir.1977) ("each branch [of government] should take

---

6. Congress' power to investigate "is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution." *Barenblatt v. U.S.*, 360 U.S. 109, 111, 79 S.Ct. 1081, 1085, 3 L.Ed.2d 1115 (1959). The House, after it has adjourned *sine die* has no power to enact or appropriate. It would follow then, that it's power to investigate is also diminished.

cognizance of an implicit constitutional mandate to seek optimal accommodation through a realistic evaluation of the needs of the conflicting branches in the particular fact situation"). All of the parties representations to this court indicated that their positions were far from irreconcilable. Nonetheless, due to the reticence, nay the refusal, of the Committee and despite repeated admonitions by the court that a negotiated settlement was the best method of resolving this dispute,[7] the parties have been unable to settle this matter. This court once again expresses its disappointment that a settlement agreement was not achieved when by all presents it could have been.

### Preliminary Injunction Standard

A court considering whether to grant a preliminary injunction must consider four factors, evaluating them on a "sliding scale". See *Illinois Psychological Association v. Falk*, 818 F.2d 1337, 1340 (7th Cir.1987). The factors are:

1. Whether plaintiff has an adequate remedy at law—i.e. will the plaintiff suffer irreparable harm if the preliminary injunction is not issued;

2. Whether the irreparable harm plaintiff will suffer if the preliminary injunction is not granted is greater than the irreparable harm the defendant will suffer if the injunction is granted;

3. Whether the plaintiff has a reasonable likelihood of prevailing on the merits; and

4. Whether the injunction will harm the public interest.

*Id.* The "sliding scale" approach means that the greater the potential harm to the plaintiff if the injunction does not issue, and the lesser the harm to the defendant if it does, the less weight the court need place on the plaintiff's likelihood of success on the merits. *Id.*

■ As this court has discussed above, Harris has no adequate remedy at law.

Should the documents be disclosed to the Committee without Harris' permission or involvement, Harris' interest in the documents' confidentiality will be irreparably harmed. More significantly, the right of the State of Illinois to protect its property (because the subpoena was not issued to the State of Illinois, Illinois cannot contest it through contempt proceedings) will have been destroyed.

Should this court grant the injunction, however, the Committee will not emerge unscathed. The Committee staff has represented to this court that it is in the midst of a legitimate legislative investigation. The grant of an injunction will necessarily delay that investigation. The harm, however, will not be irreparable. The documents will not become inaccessible to the Committee staff, rather, they simply must be sought through another channel, and it remains within the Committee's power to reach an agreement with Harris regarding adequate security procedures for the documents.

This court's discussion above makes quite clear that Harris' likelihood of success on the merits is strong, and this court need not reiterate here the factual and legal bases supporting that conclusion.

Finally, there is the question of the public interest, and this is the most difficult factor to evaluate. There is a strong public interest in preserving the constitutional boundaries between the rights of the sovereign states and those of the federal government. There is also a strong public interest in permitting Congress to carry out its duty to make those laws "necessary and proper for carrying into execution" its constitutional powers. The BNL investigation certainly fits within the realm of Congress' power.

Because the other three factors weigh so heavily in favor of Illinois, however, this court need not decide in whose favor the public interest lies in this matter. The "sliding scale" approach requires this court

---

**7.** The court on several occasions offered its assistance in settlement negotiations, those offers were tersely rebuffed by Committee staff.

to balance *all* of the factors, and that balance, even if the public interest weighed in favor of the Committee (and this court does not decide that it does) the other factors weigh so heavily in favor of the plaintiffs that this court would nonetheless grant the injunction.

*Conclusion*

The court grants plaintiffs' motion for a preliminary injunction, and enjoins the Board from turning over Illinois bank examination reports or Board reports incorporating information, and enjoins the Board from turning over Illinois bank examination reports or Board reports incorporating information in the Illinois reports to the staff of the Committee. The court further orders the Board to return the Illinois reports to their rightful owner, the State of Illinois. Because of the possibility that the Committee will issue another subpoena after the House reconvenes, this court orders Harris to maintain the documents until the final resolution of this dispute. It is this court's opinion that Congress has shamefully failed to live up to its responsibility to recognize the sovereignty of Illinois and minimally accord that state the courtesy of a direct subpoena, which would have avoided this dispute. The documents filed with this court, as well as the demeanor of the attorneys representing the Committee before the court has convinced the court that the Committee chose the path it did purely out of arrogance, and with no regard for the rights of the sovereign state of Illinois.